Robert R. BOLDING

v.

The UNITED STATES.

Robert Dewey McMILLAN, Jr.

v.

The UNITED STATES.

Milburn R. VERNOR

v.

The UNITED STATES.

Nos. 345–73 to 349–73 and 351–73.

United States Court of Claims.

Nov. 16, 1977.

Alvin L. Freeman, Houston, Tex., attorney of record, for plaintiffs; Freeman & Rockwell, Houston, Tex., of counsel.

James L. Malone, III, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

## OPINION

PER CURIAM:

The cases pertaining to the plaintiff, Robert R. Bolding, Nos. 345–73 and 348–73, come before the court on plaintiff's exceptions to the recommended decision of Trial Judge Philip R. Miller, filed March 3, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel.

The cases pertaining to the plaintiffs, Robert Dewey McMillan, Jr., Nos. 346–73, 349–73 and 351–73, and Milburn R. Vernor, No. 347–73, come before the court on plaintiffs' motion, filed September 7, 1977, requesting that as to them the court adopt, as the basis for its judgment in these cases, the said recommended decision of Trial Judge Miller, defendant having filed no intention to except or exception thereto and the time for so filing pursuant to the Rules of the court having expired. As to these cases there has been no oral argument.

Upon consideration thereof, since the court agrees with the trial judge's decision, as hereinafter set forth *, it hereby affirms and adopts the said decision as the basis for

---

\* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed March 3, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

its judgment in this case. Therefore, for the reasons set forth in the decision it is concluded that the plaintiff, Robert R. Bolding is not entitled to recover and that defendant is entitled to recover against him on its counterclaim with the amount of such recovery and ultimate dismissal of Bolding's petitions to be accomplished in further proceedings pursuant to Rule 131(c). Further, it is concluded that the plaintiffs, Robert Dewey McMillan, Jr., and Milburn R. Vernor are entitled to recover and judgment is entered for them with defendant not entitled to recover against them and defendant's counterclaims against them are dismissed. The amounts of these plaintiffs' recoveries will also be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge:

The plaintiffs in the instant cases have brought this suit for the refund of token payments made by them after they had been assessed 100 percent penalties as corporate officers for their willful failure to pay over Federal Insurance Contributions Act (FICA) and income withholding taxes (hereinafter payroll taxes) on wages paid to the employees of three corporations.[1] The Government has counterclaimed for the balances of the assessments. At stake with respect to the plaintiff Bolding is $60,062.83, plaintiff McMillan, $66,421.84 and plaintiff Vernor, $17,124.26.

Internal Revenue Code, section 6672, provides that any person who as a corporate officer or employee has a duty to collect and pay over such payroll taxes withheld from the wages of employees shall be liable to a penalty equal to the amount of taxes in question, if he willfully fails to pay over such taxes to the Government. The questions to be resolved are whether each of the plaintiffs was a party responsible for collecting and paying over the withheld payroll taxes and whether his failure to do so was willful.

The payroll taxes in question are owed by three corporations, Gulf Aerospace Corporation (Gulf) and two of its subsidiaries, Circuit Products, Inc. (Circuit) and Vernor Manufacturing Company (Vernor Manufacturing). All three failed to pay over to the Government their withheld payroll taxes for the first two quarters of 1969, while Vernor Manufacturing also failed to pay over such taxes for the last two quarters of 1968. All three corporations became bankrupt April 23, 1969.

Plaintiff Robert R. Bolding is a certified public accountant, who initially started to work for Gulf as an independent consultant on financial and accounting matters in December 1968, and from January 29, 1969 until bankruptcy was vice president for finance, secretary and treasurer of all three companies and a member of the board of directors of Gulf. Plaintiff Robert D. McMillan, Jr., was senior vice president of Gulf, vice president of Circuit and Vernor Manufacturing and a member of the boards of directors of all three. Plaintiff Milburn R. Vernor was president of Vernor Manufacturing and a member of its board.

From May 1968 until the time of bankruptcy, Gulf, the parent corporation, did not comply with the requirement that withheld payroll taxes be deposited semimonthly as trust funds in special accounts at authorized Federal Reserve banks.[2] In June 1968,

1. Bolding has paid $67.99 with respect to Gulf Aerospace Corporation, $4.94 with respect to Vernor Manufacturing Company, and $12.78 with respect to Circuit Products, Inc. The comparable amounts paid by McMillan are $67.99, $11.67 and $12.78. Vernor paid $7.28 with respect to Vernor Manufacturing alone.

2. During the years at issue, if the taxes with respect to wages for any calendar month during the preceding calendar quarter exceeded $2,500, an employer was required to deposit in

an authorized Federal Reserve bank an estimated 90 percent of the taxes on the payroll paid during each semimonthly period within 3 banking days thereafter. The balance of the taxes due was to be paid within 3 banking days after the 15th day of the following month. Treas.Reg. § 31.6302(c)–1(a)(1), T.D. 6903, 1967–1 C.B. 347, adopted pursuant to the authority of I.R.C. §§ 6302(c) and 7501.

An employer was also required to file quarterly returns (Form 941) for FICA and income tax withholding taxes on or before the last day

Donald Sumners, Gulf's chief accountant, spoke to Emmett R. Collins, Gulf's controller, about the need to make such tax deposits. Collins replied that there was not enough money with which to do so. Sumners did not bring the delinquency to the attention of McMillan or Vernor, and he left Gulf in the latter part of 1968, before Bolding arrived.

Although Gulf failed to make timely payroll tax deposits, it did file timely quarterly returns for the last two quarters of 1968 and paid the taxes it owed for those quarters with the returns. The same was not true for its two subsidiaries, Circuit and Vernor Manufacturing. After Circuit had been acquired by Gulf in July of 1968, it ceased to make the required trust deposits. In addition, it had outstanding payroll tax liabilities at the time of acquisition. Shortly thereafter, Norman J. Wogan, Circuit's president, brought to the attention of Patrick H. Buvens, Gulf's president, the failure to make the necessary tax deposits. Buvens told him to file the returns for 1968 without paying the taxes and they would be taken care of later. They were not fully paid until late March 1969.

Vernor Manufacturing similarly did not pay its payroll tax liabilities for the last two quarters of 1968. After its acquisition by Gulf in mid–1968, it transferred many of its accounting operations to the parent company's accounting department. This failure to pay the taxes for the third quarter of 1968 may initially have arisen because of confusion in regard to whether Vernor Manufacturing or the Gulf accounting department was to handle the returns. However, when the returns were subsequently prepared in January 1969, the checks that had been made out to pay the taxes were never signed or issued.

From late 1968 until the date of bankruptcy, it was common knowledge among the employees of Gulf and its subsidiaries that the companies were in a difficult cash position. The economic problems at Gulf became worse prior to March of 1969. The cash position of the companies was so bad that shortly before the bankruptcy, Gulf and its subsidiaries were on a cash-on-delivery or prepayment basis with most suppliers.

Buvens maintained very close financial control over Gulf and its subsidiaries. He and Collins supervised the payment of creditors. They followed daily reports on the cash position of the companies. When Buvens was present, checks, even when made out, were normally not released without his approval. Similarly, permission had to be obtained from Buvens by the heads of the operating divisions before even small items could be purchased.

McMillan, senior vice president of Gulf, was not in charge of financial affairs. His duties were concerned primarily with manufacturing and assembly operations of all three companies. However, he did participate in financial matters by assisting in the preparation of budgets and supporting the staffs of the various operating divisions in their efforts to obtain necessary supplies and equipment. They and McMillan set up priority lists which ranked creditors in accordance with their importance in keeping the operations going. They also made up requirements lists of supplies and equipment necessary for production. McMillan would confer with Buvens on the priority and requirements lists. Buvens normally, although not always, followed the priority lists of creditors given by the operating divisions.

The accounting records maintained by the Gulf accounting department were in poor condition. For several reasons there tended to be a material understatement of liabilities at any given time. First, the records were not kept up-to-date. Second, liabilities were not always recorded currently. Third, checks were sometimes made out by the accounting department regardless of whether funds were available and entered in the general ledger as reducing liabilities,

of the month following the quarter, or 10 days later if he had made timely semimonthly deposits. Treas.Reg. § 31.6011(a)–1(a)(1) and 6011(a)–4 (1959); 31.6071(a)–1, T.D. 6941, 1968–1 C.B. 543, 546.

despite the fact that Collins and Buvens still retained them because of insufficient funds.

As part of an effort to obtain additional working capital, Gulf had to issue an accurate financial report. Its certified public accountants, Touche, Ross, Bailey & Smart, began an audit of its records for the accounting period ending September 30, 1968. Shortly thereafter the firm informed Buvens that additional in-house work had to be performed before it could certify any financial report. It recommended to Buvens for this purpose Bolding, an independent CPA, and Buvens retained him in early December 1968 to work as a consultant with the primary duty to assist the auditors by working on the accounts payable and inventory.

On January 29, 1969, Bolding was hired on a more permanent basis, as vice president for finance, secretary and treasurer of Gulf and its subsidiaries. He continued to be responsible for the accounting work for the audit for the period ending September 30, 1968; however, he also was involved with other more current financial matters. He reviewed or signed as the authorizing party numerous requests for the issuance of checks, thereby acquiring a measure of control over the disbursement of funds. He also had the responsibility to prepare current consolidated financial statements for Gulf and its subsidiaries, and he was charged with improving their accounting systems.

Bolding also concerned himself with the payment of creditors. The heads of the various operating divisions talked with him about their financial requirements and the necessity of paying first those suppliers whose products were needed most. Bolding would then convey this information to Buvens. In some instances he also dealt directly with creditors who were seeking collection of past-due or disputed accounts.

From late December 1968 until the time of bankruptcy the payroll tax forms for the parent company were prepared in Gulf's accounting department by Layton Hughens, the chief accountant. He reported directly to Collins, his immediate superior. He did not work with Bolding on the tax returns.

McMillan had been authorized to sign checks on the accounts of Gulf and its subsidiaries since April 1968. He, together with one cosignatory, could sign checks in amounts up to $5,000. It is not clear as to when Bolding received his initial check-signing authority. Bolding's first signed checks are dated January 29, 1969.

Before March 1969, McMillan and Bolding only signed checks occasionally. Buvens or Collins normally signed smaller checks for the payment of Gulf's creditors and they signed larger ones jointly. Until March 1969, McMillan and Bolding would ordinarily sign checks only in situations in which Buvens and Collins were absent and there was no reason to await their return, such as when a C.O.D. delivery from a supplier arrived.

Bolding's authority over the financial affairs of Gulf increased with the passage of time. In late February 1969, a resolution, effective March 5, 1969, increased Bolding's and McMillan's authority to issue checks on their joint signatures on the main accounts of Gulf and Vernor Manufacturing from $5,000 to $25,000.

During much of the period from early March 1969 up to bankruptcy, Buvens was away from the company. He went on a 2-week vacation to South America; he traveled to Washington, D.C., for contract negotiations in which Gulf was involved. In addition, he was ill part of the time. Collins also was absent from his office during part of this period for both personal and business reasons. He too went to Washington for contract negotiations.

During this period, Bolding and McMillan jointly exercised their authority over disbursements and payment of creditors. Their check-signing activity increased markedly. Of the 228 Gulf checks drawn for payment of creditors during March and April 1969, Bolding's signature appears on 193 in the aggregate sum of $257,323, while McMillan's signature appears on 114 in the total amount of $173,767. For the same

period, Bolding's signature appears on at least six Circuit checks for $8,707 in disbursements to creditors, while McMillan's is on five for $8,568; and Bolding's signature appears on $11,894 in Vernor Manufacturing checks, while McMillan's is on $9,920.

Milburn R. Vernor, the third plaintiff, was president of Vernor Manufacturing and responsible only for the fabrication and assembly operations thereof. After July of 1968 he was not a signatory on any Vernor Manufacturing checking account and, thus, had no part in the dissipation of the tax trust funds of any of the corporations. In its brief defendant concedes that Vernor may not be held liable for any of the penalties in issue.

■ Under the system of withholding taxes provided by the Internal Revenue Code, employees are entitled to credit for the amounts of FICA and income taxes withheld from their wages regardless of whether or not the employer turns the funds over to the Government. I.R.C. §§ 1462, 3102(a); *Dillard v. Patterson,* 326 F.2d 302, 304 (5th Cir. 1963). Since, therefore, the Government may actually be out-of-pocket by way of credit or refund for taxes it has never received, Congress has allowed the IRS more stringent protective devices to insure collection of payroll taxes than in the case of many other taxes. Liability for the payment over of withholding taxes arises at the time the sums are withheld from the employees' wages rather than at the later date when the employer's quarterly tax return is filed. *Kalb v. United States,* 505 F.2d 506, 509 (2d Cir. 1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975). *Long v. Bacon,* 239 F.Supp. 911 (S.D.Iowa 1965); *Seaton v. United States,* 254 F.Supp. 161 (W.D.Mo. 1966). The amount of tax collected by the employer is held to be "a special fund in

trust for the United States". I.R.C. § 7501(a). Ninety percent of such trust funds is required to be deposited in a special account in a Federal Reserve bank semimonthly and the remainder during the following month, even prior to the due date of the quarterly return. I.R.C. § 6302(c); Treas.Reg. 31.6302(c)–1(a), T.D. 6903, 1967–1 C.B. 347. If the withheld tax cannot be collected from the employer corporation it may be collected in the form of a 100-percent penalty from the officers responsible for the failure to pay it over. I.R.C. § 6672.[3]

Section 6672 provides:

§ 6672. Failure to collect and pay over tax, or attempt to evade or defeat tax

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. * * *

Section 6671 makes it clear that the person referred to in section 6672 is meant to include the corporate employer's officer. It states:

§ 6671. Rules for application of assessable penalties

* * * * * *

(b) Person defined.—The term "person", as used in this subchapter, includes an officer or employee of a corporation, * * * who as such officer, employee, * * * is under a duty to perform the act in respect of which the violation occurs.

And *see also McCarty v. United States,* 437 F.2d 961, 971, 975, 194 Ct.Cl. 42, 61–62, 68 (1971). Defendant also states in its answer that any judgment obtained in this case for the amount of the penalty sought in the counterclaim will be abated to the extent that it is collected from other officers who are also liable.

---

**3.** The nature of the penalty as primarily a collection device is confirmed by IRS Policy Statement P–5–60, approved November 5, 1956 (IR Manual MT 1218–56, dated February 25, 1976, reproduced in 8 CCH 1977 Stand.Fed.Tax Rep. ¶ 5569), which provides that the penalty may be collected from the officer only if the tax cannot be collected from the corporation itself.

■ Since a corporation acts through its officers, absent evidence to the contrary, presumptively a person who occupies the offices of vice president, secretary and treasurer with authority to make disbursements has the duty to carry out what the law requires of the corporation, namely, the segregation and payment over to the Government of trust funds withheld from employees' wages. *Newsome v. United States*, 431 F.2d 742, 746 (5th Cir. 1970). As Bolding served as vice president for finance, secretary and treasurer of Gulf, Circuit and Vernor Manufacturing from the latter part of January 1969, and McMillan was also senior vice president of all three corporations from an even earlier date, and as they had joint authority to disburse corporate funds from its bank accounts, unless rebutted the fair inference is that they were such persons as are defined by section 6671(b).

Bolding has attempted to down-rate his authority by showing that despite his titles he did not have full control over the accounting department. Collins, as controller, supervised the day-to-day activities of that department and did not take lightly Bolding's new authority over it; he was uncooperative and interfered with the carrying out of Bolding's instructions. Nevertheless, the record shows, Bolding did have a considerable financial role. He monitored and approved "Request for Check" forms for payment of corporate debts. His increased status vis-a-vis Collins is shown by the fact that by early March 1969 Bolding became entitled to cosign checks for up to $25,000, while Collins' check-signing authority remained limited to $5,000 and with respect to Vernor Manufacturing was wholly withdrawn. In Buvens' absence, Bolding and McMillan, rather than Collins, were the highest executives present at the corporate premises. This is shown by the extensive check-signing and disbursement activities in which they were engaged during March and April 1969.

Were Bolding and McMillan responsible for the corporations' failure to turn over the withheld funds to the Government? Again the answer must be in the affirmative.

In March and April 1969, Vernor Manufacturing had failed to pay over and was delinquent with respect to at least $12,855 in 1968 payroll taxes, and up to April 23, the date of bankruptcy, the three corporations owed an aggregate of at least $53,567 more in 1969 payroll taxes. They did not set aside the withheld taxes as trust funds, nor did they make deposits in trust accounts at Federal Reserve banks. Instead, the corporations treated the trust funds as any other assets to be used for business purposes. The fact that the returns and final payment of the taxes for the first and second quarters of 1969 were not due until April 30, and June 30, 1969, respectively, is not relevant with respect to the penalty. "As the employer withholds taxes from employees' wages a contingent liability is created. The liability merely becomes fixed on the due date." *Kalb v. United States, supra* at 509; and *see also Newsome v. United States, supra* at 745–46.

Although Gulf owed payroll taxes of $42,041.56 for the quarter ended March 31, 1969, plus an additional $806.60 for the period from April 1, to April 23, 1969, when Gulf became bankrupt, during March and April in the exercise of his joint check-signing authority Bolding chose to pay creditors other than the United States an aggregate of $257,323. Although for the first and second quarters of 1969 until April 23, 1969, Circuit owed $6,449.42 in payroll taxes, Bolding cosigned checks on Circuit's bank account in payment of debts owed other creditors in the sum of $8,708. Although for the quarters ending December 31, 1968 through March 31, 1969, Vernor Manufacturing owed payroll taxes of $10,763.31, during March and April Bolding signed checks on Vernor Manufacturing bank accounts in payment of other creditors in the sum of $11,894. The corresponding disbursements for the same periods over McMillan's signature are, respectively, $173,767, $8,568 and $9,920. It must, therefore, be concluded that sufficient funds were available from which to pay over to the United States the payroll tax liability of

all three corporations, but that Bolding and McMillan used the funds instead to pay other creditors.

■ If the preference for the debts of other creditors over the liability to the United States by one under a duty to pay over payroll taxes is intentional, it constitutes a willful failure to collect and pay over the taxes within the meaning of section 6672. *Scott v. United States*, 354 F.2d 292, 296, 173 Ct.Cl. 650, 656 (1965); *White v. United States*, 372 F.2d 513, 521, 178 Ct.Cl. 765, 779 (1967); *Burack v. United States*, 461 F.2d 1282, 1291, 198 Ct.Cl. 855, 870, (1972).

■ Plaintiffs place emphasis on the controlling role of Buvens in the financial affairs of the corporations. However, this does not help them. Section 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs. "Realistically read, [§ 6671(b)] encompasses all those who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of [§ 6672], even though liability may thus be imposed on more than one person." *Scott v. United States supra*, 354 F.2d at 296, 173 Ct.Cl. at 657. And *see also McCarty v. United States*, 437 F.2d 961, 967, 194 Ct.Cl. 42, 54–55 (1971), *White v. United States*, 372 F.2d at 517, 178 Ct.Cl. at 771, and *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). (Nevertheless, as noted, defendant does state in its pleadings that to the extent it receives payment from others it will abate the judgments it seeks here on the counterclaims.)

■ Plaintiffs also point to Buvens' withdrawal of $123,990 from Gulf as a reason for setting aside the assessments against the plaintiffs. However, such withdrawal, asserted by Buvens to be in payment of sums previously advanced by him, cannot mitigate the liability of others. The withdrawal took place February 7, 1969. As the record of Bolding's and McMillan's disburse-ments indicates, even after Buvens' withdrawal, from the beginning of March until the bankruptcy on April 23 they still had control over enough funds to pay over the tax liabilities of all three corporations, but opted in favor of other creditors.

■ The fact that neither Bolding nor McMillan was able to authorize the disbursements on his individual signature alone does not relieve them of liability. By withholding his signature each could have prevented the dissipation of the corporate funds which should have been set aside to pay the payroll taxes. In *Burack v. United States, supra*, 461 F.2d at 1291, 198 Ct.Cl. at 869, the court held that a corporate officer may be liable under section 6672 of the Internal Revenue Code even though his control over the disposition of the corporate funds is limited by the requirement that there be two signatures on every check. The court stated:

> But to be a responsible person or officer under the statute, one does not have to be the sole such person or have "exclusive control over all corporate affairs * *." The fact that the Raddings may also have qualified as responsible officers does not acquit plaintiff. The Raddings may have given directions as to what checks should be drawn to pay which creditors, but *those checks were worthless without plaintiff's cosignature. Authority to cosign in effect gives one the authority to decide which creditors should be paid.* Plaintiff may not have participated in the preparation of the checks, but he had the power to prevent disbursement of funds except to appropriate creditors, and there can be no question that he had as much power and authority as the Raddings to direct to whom checks should be drawn. [Emphasis added; citation omitted.]

And *see also McCarty v. United States, supra*, 437 F.2d at 968, 194 Ct.Cl. at 56; *Turner v. United States*, 423 F.2d 448 (9th Cir. 1970); *Silberberg v. United States*, 355 F.Supp. 1163, 1166–67 (S.D.N.Y.1973); *Melillo v. United States*, 244 F.Supp. 323 (E.D. N.Y.1965).

■ In order to hold a person liable under Internal Revenue Code, section 6672, it is necessary not only that he be "responsible" but also that his failure to pay the taxes be "willful." *Burack v. United States, supra,* 461 F.2d at 1285, 198 Ct.Ct. at 859.

The failure to pay over the taxes owed to the Government is deemed "willful" for the purposes of the statute if it results from (*White v. United States, supra,* 372 F.2d at 521, 178 Ct.Cl. at 778–79)—

> a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government, and * * * it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness.

Or as the Fifth Circuit put it in a practical context (*Newsome v. United States, supra* at 746):

> The responsible officer's actions before the due date for payment of the withheld taxes satisfies the "willfulness" requirement under section 6672: when the responsible officer (as defined by section 6671(b)) knows that the withheld funds are being used for other corporate purposes, regardless of his expectation that sufficient funds will be on hand on the due date for payment over to the government. Of course, the officer is only liable under section 6672 if the corporation does not pay over the withheld taxes at the date prescribed in the regulations. However, he subjects himself to liability under 6672 when he voluntarily and consciously "risks" the withheld taxes in the operation of the corporation and subsequently the corporation is unable to remit the withheld taxes.

■ More than mere negligence is required for "willfulness"; a person is not "willful" if as a result of negligence he is unaware of the default in the payment of payroll taxes. *Bauer v. United States,* 543 F.2d 142, 150, 211 Ct.Cl. 276, 289 (1976). But willful conduct may also include "a reckless disregard for obvious or known risks." *Monday v. United States, supra,* at 1215; *Kalb v. United States, supra* at 511.

■ Both Bolding and McMillan allege an absence of willfulness because they lacked knowledge as to the nonpayment of the taxes. The burden of proof on this issue, as on other elements of plaintiffs' claims and the Government's counterclaims for the unpaid balance of the assessments, was upon plaintiffs, requiring them to show that the Commissioner's determinations were erroneous. *Liddon v. United States,* 448 F.2d 509, 513–14 (5th Cir. 1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); *Psaty v. United States,* 442 F.2d 1154, 1159–60 (3rd Cir. 1971); *Lesser v. United States,* 368 F.2d 306, 310 (2d Cir. 1966) (en banc); *Fitzgerald v. United States,* 407 F.Supp. 1132 (E.D.Ky.1976).

The record fails to support Bolding's claim that he lacked knowledge of the unpaid payroll taxes.

Bolding is and was a certified public accountant. He was brought into the corporations in December 1968 to straighten out and simplify their accounting and to help prepare responsible and accurate financial statements which might enable the corporations to obtain additional financing. He apparently took hold of financial affairs rapidly, so that in 1 month he was appointed vice president for finance, and secretary and treasurer of all three corporations. In such offices he was to be in charge of accounting operations, accounts receivable, accounts payable, cost accounting and other matters relating to the preparation of the consolidated company financial reports. Department heads and the president of the subsidiaries discussed their financial needs with Bolding, and he made recommendations to Buvens as to meeting their requirements. He reviewed and sought to simplify the accounting systems and entries. He also engaged in the preparation of operating budgets for the 1969 year.

In view of the shortage of funds, Bolding participated in the establishment of priorities for payment of suppliers and other

creditors. He dealt directly with creditors with respect to the accuracy of their billings and the corporations' past-due accounts. He sought to obtain better control over disbursements by reviewing and subjecting requests for the issuance of checks to his prior approval. And most importantly, as previously noted, he was delegated authority to sign and countersign checks for up to $25,000 in payment of creditors, an authority which he exercised in many instances in Buvens' absence.

In a position of such responsibility Bolding could hardly have functioned without an overall view of the accounting records and financial conditions of the three corporations.

J. Layton Hughens, Gulf's chief accountant, testified without contradiction that each month he entered the payroll taxes withheld from wages paid during the month in separate accounts in the accounts payable ledger, and no later than the 15th or 20th of the following month he prepared and turned over to Bolding a monthly financial statement. Bolding also received and reviewed monthly trial balances from the subsidiaries. Intercorporate memoranda show that he directed they be furnished him by about 1 week after the close of the month. These would necessarily show the balances in the payroll tax liability accounts. At the same time Bolding received daily cash statements showing receipts and disbursements by items, and, therefore, unquestionably the knowledge was available to him that no checks for the payroll taxes had been issued.

In late January 1969, Bolding prepared the payroll tax returns of Vernor Manufacturing for the third and fourth quarters of 1968, at least the first of which was necessarily delinquent (since it should have been filed by October 31, 1968). Treas.Reg. § 31.6071(a)–1, T.D. 6941, 1968–1 C.B. 543, 546. Checks were prepared for payment of the taxes, but they were not signed, and at some unspecified later time they were marked "void". Although Bolding maintains he was unaware that the checks were not paid, they were never entered as pay-

ments in the ledger accounts showing the tax liabilities and hence the unpaid taxes continued to be shown on the Vernor Manufacturing trial balances for January, February and March 1969, which Bolding received and reviewed. Moreover, the checks never appeared as disbursements in the daily cash statements furnished Bolding.

Norman J. Wogan, the president of Circuit, testified that he told Bolding about Circuit's outstanding payroll tax liabilities. Moreover, Circuit's books were not subject to criticism that the accounting therein was sloppy and incomplete, as in the case of Gulf. Circuit had its own bookkeeper and maintained its own records. Payrolls and payroll tax returns were prepared by Circuit's bookkeeper. The accounts were kept current and accrued tax liabilities for the tax trust funds not deposited were recorded in them.

Even apart from the trial balances, financial statements and Bolding's general familiarity with the financial affairs of the corporations, other evidence supports the inference that Bolding knew of the accrued payroll tax liabilities. He unquestionably knew that the corporations had large payrolls and that they deducted and withheld payroll taxes from the employees. As previously discussed, the corporations' liability for the payroll taxes arose at the time of the withholding. The only way the corporations could have acquitted themselves of their liability prior to the filing of their quarterly returns was by making the semimonthly deposits in trust in a Federal Reserve bank, as set forth in the Treasury Regulations. From the beginning of the year to April 23, 1969, the date of bankruptcy, seven such deposits were due. Only Circuit made one, on April 7, 1969, in the sum of $1,865.19. From the daily cash statements and the record of disbursements, plus the fact that he personally was not called upon to sign or countersign checks for payroll tax deposits during the period when Buvens was away and he and McMillan were in charge of finances, Bolding must have necessarily been aware that the companies were failing to make the deposits and that the payroll taxes remained due.

■ Under all of the circumstances of Bolding's participation in and supervision of the financial affairs of the three companies, his argument that he paid attention only to the commercial accounts payable and was unaware of accounts showing more than $48,000 in unpaid Gulf payroll taxes and $66,000 for all three companies strains credulity. At best, his argument amounts to the position that even with knowledge of a corporation's financial straits a responsible officer may immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of its withholding taxes. But such a deliberate or reckless disregard of the facts and known risks cannot blunt the impact of the penalty statute on those responsible for such nonpayment. *United States v. Leuschner,* 336 F.2d 246 (9th Cir. 1964); *Monday v. United States, supra; Fitzgerald v. United States, supra* at 1136.

■ Although McMillan was a responsible person, the record is insufficient to refute his testimony that he was unaware of the failure to pay the taxes or make the required deposits. Although he signed numerous checks as a cosignatory, he was not responsible for accounting or for supervising finances. His specialization was the manufacturing and assembly end of the business. In light of his duties and responsibilities there is no basis for imputing to him either knowledge or reckless disregard of the unpaid payroll tax liabilities, or of the failure to make the trust deposits. Therefore, he is not liable for the willful failure to pay over the taxes under section 6672.

## CONCLUSIONS OF LAW

### I

Bolding was a responsible person within the meaning of I.R.C. § 6671(b), who was required to collect, truthfully account for, and pay over the payroll taxes due from Gulf, Circuit and Vernor Manufacturing. He willfully failed to do so and he is therefore liable for the penalties assessed against him pursuant to I.R.C. § 6672. Bolding is accordingly not entitled to a refund of the portion of the penalties paid and is liable to defendant for the amount assessed and unpaid. He is not entitled to recover; and defendant is entitled to recover against him on its counterclaim. The amount of the recovery is to be determined pursuant to Rule 131(c).

### II

McMillan, although a responsible person, did not act willfully in regard to the failure of Gulf and its subsidiaries to pay the payroll taxes. Therefore, he is not liable and is entitled to recover the amount he paid; while defendant is not entitled to recover on its counterclaim and it is dismissed. The amount of the recovery is to be determined pursuant to Rule 131(c).

### III

Vernor was not a responsible person in regard to the failure of Vernor Manufacturing to pay the payroll taxes. Therefore, he is not liable and is entitled to recover the amount he paid; while defendant's counterclaim is dismissed. The amount of the recovery is to be determined pursuant to Rule 131(c).