865 F.2d 1267
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Walter CLOUSE, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 88-1010.
 United States Court of Appeals, Sixth Circuit.
 Jan. 17, 1989.
 
 Before KENNEDY, RALPH B. GUY, Jr. and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff-appellant Walter Clouse appeals a district court order granting judgment notwithstanding the verdict (j.n.o.v.) assessing tax liability against him pursuant to I.R.C. Sec. 6672 for his willful failure to account for and pay over to the government, as a person responsible for doing so, federal taxes withheld from employee wages. Clouse was the production manager of a former manufacturing corporation known as OCTRA that failed to pay withholding taxes for the first two quarters of 1980.
 
 
 2
 A Motion for JNOV is properly granted only when a jury's verdict is unreasonable as a matter of law because, on the evidence presented, reasonable minds could not differ that the verdict returned is not supported in the evidence. As this court indicated in Ratliff v. Wellington Exempted Village Schools Board of Education, 820 F.2d 792, 795 (6th Cir.1987):
 
 
 3
 In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. An appellate court when reviewing the trial court's decision is bound by the same standard. Morelock v. N.C.R. Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906 (1979).
 
 
 4
 Our review of the disputed factual record in this case indicates that the jury's finding that Clouse was not a person responsible for the payment of payroll taxes was not unreasonable as a matter of law. We therefore reverse the district court's order granting JNOV.
 
 I.
 
 5
 In late 1969, Walter Clouse purchased, with two others, a casting company they incorporated as Oxford Precise Casting, Inc. (Oxford). Because of his success running Oxford, Clouse was able to purchase, with one other, a second company engaged in fabrication, large machine building, and other manufacturing. That company was incorporated as OCTRA. Clouse was a director and the majority stockholder of OCTRA.
 
 
 6
 In 1973, Clouse's corporations experienced financial difficulty when an outside debtor company with whom they were doing business indicated an intention to file for bankruptcy. That company, Arc-Mation, owed Oxford and OCTRA approximately $700,000 each, was responsible for approximately one-third of OCTRA's business, and was delinquent in its payment of payroll taxes. Oxford, which was also apparently behind in the payment of payroll taxes, acquired Arc-Mation for $10. The Internal Revenue Service (I.R.S.) ordered both plants closed until all taxes owing were paid.
 
 
 7
 On the recommendation of a financial adviser, Clouse retained the services of a certified public accountant, Wayne Leeser, for help in resolving his corporations' tax problems. Leeser negotiated a settlement with the I.R.S. and ten days later Oxford resumed business. Arc-Mation never reopened. At this time Leeser stressed to Clouse that payment of employee withholding taxes must always be given top priority--before all other debts.
 
 
 8
 Leeser became increasingly involved in administration of both OCTRA and Oxford, eventually becoming president of Oxford. Clouse supervised manufacturing operations of both companies. But in late 1975, the relationship between Clouse and Leeser deteriorated. Clouse sold his entire interest in OCTRA to Leeser for $1,000 down, with the balance of $236,000 to be paid later. Clouse loaned Leeser the $1,000 down payment. He resigned as an officer and director of OCTRA, and left town to concentrate his efforts at Oxford.
 
 
 9
 Business did not prosper for Clouse at Oxford and in 1978 Clouse agreed to sell Oxford's assets to OCTRA for $468,000, with $100,000 down. The agreement also permitted OCTRA to move into and rent the building formerly housing Oxford. Clouse owned that building. Part of the agreement provided that OCTRA employ Clouse to run OCTRA's manufacturing operations. Clouse subsequently purchased a 5% interest in OCTRA from a minority shareholder.
 
 
 10
 OCTRA moved into Clouse's building in the fall of 1978. Leeser, Sharon Iser, the OCTRA bookkeeper, and Linda Tanner, OCTRA's salesperson and corporate secretary, occupied the office portion of the building; Clouse moved to a makeshift office on the manufacturing floor.
 
 
 11
 OCTRA's business began to decline in early 1980. During that time, OCTRA failed to make payments on all of its liabilities which included loans, rent, purchasing, and payroll. In addition, during the first two quarters of 1980 the corporation did not pay to the government the amounts it had withheld from employee salaries. Subsequently, OCTRA filed for bankruptcy but not before assigning a valuable contract to Press Automation, a smaller company owned by Clouse that was willing to fulfill OCTRA's contractual obligations and receive contract payments as partial satisfaction of the debts owed to Clouse by OCTRA.
 
 
 12
 On March 22, 1984, the I.R.S. notified Clouse that it was holding him liable for $27,293.03, or 100% of the unpaid OCTRA payroll taxes for the first two fiscal quarters of 1980, ending March 31, 1980 and June 30, 1980. The I.R.S. determined that Clouse was a person responsible for withholding and paying over OCTRA payroll taxes who willfully failed, in violation of 26 U.S.C. Sec. 6671 et seq., to pay those taxes. Clouse paid $340 of the assessment but later commenced this action for its return and return of an additional $1,388.70 that the I.R.S. had applied to the assessment from Clouse's 1982 income tax refund. The United States counterclaimed for the remainder of the assessment, plus interest from May 27, 1984.
 
 
 13
 At trial, Walter Clouse, Sharon Iser, and Linda Tanner testified as witnesses for the plaintiff. Clouse's theory was that he was not a "responsible person" within the meaning of Sec. 6672 and/or that his failure to file the taxes was not willful within the meaning of the statute. Clouse testified that he signed or co-signed checks that someone else drafted in the absence of Leeser, but only upon Leeser's direction. He testified that he was not aware of, and never told of, the fact that OCTRA was behind in its payroll taxes, had no access to any books or records, and knew nothing of the specific finances of the company beyond its experiencing difficulty in meeting payments. He stated that he was not an OCTRA director and never attended a board meeting. With respect to his title of vice president of manufacturing, Clouse indicated that the board did not appoint him vice president, but that the title merely appeared on business cards one day. Leeser instructed Clouse to use the business cards for marketing purposes only and, following disputes in early 1980, Leeser reduced his title to marketing manager. With respect to the government contract that OCTRA assigned to Press Automation in 1980, Clouse testified that the government asked Press Automation to perform it, if possible, because the government considered OCTRA in default.
 
 
 14
 Sharon Iser testified that whenever she deviated from her usual practice of merely paying the bills most overdue first, it was Leeser and no one else who told her which creditors she should pay. She testified that she was responsible for calculating payroll taxes and that Leeser decided when not to send those checks to the I.R.S. She confirmed Clouse's testimony that he had no access to her books or records, and that, as far as she knew, only she and Leeser knew for a fact that Leeser had decided not to send payroll tax checks to the I.R.S. With respect to the hiring and firing of plant personnel, she testified that she, Clouse, and Leeser had the necessary authority to make those decisions. She also testified that Clouse determined whether production would start or stop on a given day, that she had previously stated that Clouse used his debt to control some actions in OCTRA, and that when Leeser traveled, Clouse ran the shop.
 
 
 15
 Linda Tanner testified that Clouse was in charge of manufacturing only. She stated that only Leeser had final authority to decide which creditors OCTRA would pay; that Clouse had neither authority nor ability to direct creditor payments, although Clouse did tell Leeser which creditors Leeser should pay if OCTRA was to obtain the necessary supplies to continue production. She stated that Clouse was neither a director nor an officer, although Leeser appointed him a nominal vice president of manufacturing. Tanner testified that Clouse had authority to hire and fire employees on the plant floor, and that she, like Clouse, had authority to sign Leeser-approved checks when he was unavailable. She indicated that Leeser shielded money matters from Walter Clouse, directed whom the company would pay, and kept a $62,000 check owed to Press Automation, stating that he planned to use it to pay the taxes due. Tanner did not tell Clouse of Leeser's actions because she felt that her orders came from Leeser.
 
 
 16
 At the close of the plaintiff's testimony, the government moved for a directed verdict which the court denied. Thereafter, the government presented its sole witness, Wayne Leeser. Leeser testified that as senior vice president of OCTRA, Clouse ran the company's manufacturing operation. He testified that Sherry Iser had the authority to hire plant individuals, although Clouse could recommend that OCTRA hire a particular person with certain capabilities if needed. Leeser testified that at one period Clouse sealed up the plant after a temporary falling-out with Leeser, after which "the status between Walter and I was strained, to say the least." Leeser testified that he discussed OCTRA's financial problems, including payroll tax liability "with the entire board of directors, with the management people themselves, and Walter Clouse." He stated that his discussions with Clouse occurred during their twice-weekly lunches.
 
 
 17
 After deliberating over the evidence, the jury concluded that "Walter Clouse [had] shown by a preponderance of the evidence that he was not a person responsible for accounting and paying over the taxes withheld from the wages of employees of OCTRA" during the first and second quarters of 1980. Following the court's entry of judgment in Clouse's favor, the government moved for j.n.o.v. The court granted the defendant's motion with respect to the first quarter of 1980.
 
 
 18
 In entering judgment for the government, the district court necessarily held as a matter of law that Clouse was a person responsible for the payment of taxes during the first quarter of 1980 and that his nonpayment was willful. The district court stated that "[P]laintiff [had] either a complete awareness of OCTRA's financial difficulties or prior experience which certainly put him on notice that OCTRA's withholding taxes had not been paid and a willingness to prefer himself over the other creditors of OCTRA, including defendant, as OCTRA was heading towards bankruptcy."
 
 II.
 
 19
 Sections 3102 and 3402(a) of the Internal Revenue Code of 1954, now termed the Tax Reform Act of 1986, require employers to withhold social security and income taxes from employee wages, and to hold these taxes in trust for the government. 26 U.S.C. Sec. 7501. The money is held for the government's exclusive use, not for the employer's business expenses or other purposes. McGlothin v. United States, 720 F.2d 6, 8 (6th Cir.1983). Because the code credits employees with payment of the tax when it is withheld, in order to ensure receipt of withheld amounts, Sec. 6672 provides 100% joint and several liability for individuals responsible for collecting and paying the tax who willfully fail to pay the amount due. McGlothin, 720 F.2d at 8.
 
 
 20
 This court recently addressed I.R.C. Sec. 6672 and the principles relevant to its application in Gephart v. United States, 818 F.2d 469 (6th Cir.1987). In Gephart, the court stated:
 
 
 21
 It is well-established that the test for determining the responsibility of a person under Sec. 6672 is essentially a functional one, focusing on the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors. United States v. Davidson, 558 F.Supp. 1048, 1052 (W.D.Mich.1983). Section 6671(b) of the Internal Revenue Code of 1954 defines the word "person" to include "an officer or employee of a corporation ... who as such officer or employee ... is under a duty to perform the act in respect of which the violation occurs."
 
 
 22
 Among the specific facts which courts have relied upon in determining whether individuals were persons responsible for the payment of taxes withheld from the wages of employees are: (1) the duties of the officer as outlined by the corporate by-laws; (2) the ability of the individual to sign checks of the corporation; (3) the identity of the officers, directors, and shareholders of the corporation; (4) the identity of the individuals who hired and fired employees; (5) the identity of the individuals who were in control of the financial affairs of the corporation. Braden v. United States, 318 F.Supp. 1189, 1194 (S.D.Ohio 1970), aff'd, 442 F.2d 342 (6th Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971).
 
 
 23
 More than one person can be a responsible officer of a corporation. Id. Essentially, liability is predicated upon the existence of significant, as opposed to absolute, control of the corporation's finances. Davidson, 558 F.Supp. at 1053. It is basically a factual inquiry. Generally, such a person is one "with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes," or more explicitly, one who has "authority to direct payment of creditors." Barrett v. United States, 580 F.2d 449, 452, 217 Ct.Cl. 617 (1978).
 
 
 24
 818 F.2d at 473.
 
 III.
 
 25
 Clouse argues that "for every factor identified in Braden as crucial to the determination of responsibility, Plaintiff succeeded in proving that he was not responsible." We agree that when viewed in Clouse's favor, the facts of this case distinguish it from Braden with respect to each of the Braden factors that are crucial to determining one a "responsible person" under Sec. 6672.
 
 
 26
 Although the president of OCTRA, Wayne Leeser, referred to Clouse as vice president, the corporate by-laws gave Clouse no authority. Leeser gave Clouse no authority with respect to any financial aspect of the corporation except the ability to co-sign checks. But even then, Leeser limited Clouse to signing corporate checks that Leeser had previously approved and only when Leeser was unavailable. Although Bolding v. United States, 565 F.2d 663, 215 Ct.Cl. 148 (1977), adopted verbatim, a district court opinion in which the judge indicated his belief that "[a]uthority to co-sign in effect gives one the authority to decide which creditors should be paid," 565 F.2d at 671, this court has not been so quick to adopt this conclusory statement as gospel. Clouse was not an officer-in-fact, a director, or a significant shareholder of the corporation. The evidence, when viewed in his favor, also indicates that although the corporation considered his recommendations when hiring or firing manufacturing personnel, others had ultimate decision-making authority.
 
 
 27
 Braden ultimately focuses on the identity of individuals in control of the financial affairs of the corporation who had "authority to direct payment of creditors." The district court focused on the ability of Clouse to lock out workers and shut down production and his ability to force OCTRA to assign a profitable contract to Press Automation, in exchange for a credit of around $200,000 on the monies due Clouse from OCTRA, as crucial to the court's determination that the jury verdict was unreasonable. But Clouse's ability to stop production resulted from his supervision of the manufacturing operation, not any ability to direct the financial affairs of OCTRA. His ability to lock out the corporation resulted from his status as landlord of the building in which OCTRA operated, not his status as an officer or an employee of the corporation. Furthermore, testimony indicated that OCTRA could not perform the government contract and that the government, considering OCTRA to be in, or close to, default, had asked Press Automation to assume OCTRA's obligations. The ability of Clouse, as a substantial creditor to negotiate for repayment of his debt, or as an unpaid landlord to lock out a tenant, is quite distinct from any corporate "authority to direct payment of creditors." Barrett v. United States, 580 F.2d 449, 452, 217 Ct.Cl. 617 (1978) (emphasis added).
 
 
 28
 The government's authority fails to support its argument that, as a matter of law, Clouse was a responsible person within the meaning of Sec. 6672. In Gephart v. United States, 818 F.2d 469 (6th Cir.1987), the "responsible person" was the general manager of a computer store. He was responsible for "many of the ordinary day-to-day administrative, accounting, and operating functions of the business." (818 F.2d at 471). The company placed no monetary limit on the manager's check-signing authority and he directed payment decisions. He had full access to, and did review, accounts.
 
 
 29
 Clouse's involvement hardly approaches Gephart's; his situation is more analogous to two cases that Gephart distinguished in which the courts did not find the plaintiffs to be responsible persons within the meaning of the Code. In Geiger v. United States, 583 F.Supp. 1166 (D.Ariz.1984), "the court refused to find liability where plaintiff was not a shareholder, director, or officer of the corporation and where plaintiff signed checks 'only at the behest and direction' of the company's president." Gephart, 818 F.2d at 474, (quoting Geiger, 583 F.Supp. at 1168-69). In Barrett, the court rejected the government's claim where, although the company authorized Barrett to sign checks, she was not responsible for making up payroll, preparing tax returns, billing customers, directing creditor payment, negotiating contracts, or hiring/firing employees. Clouse's situation is more analogous to those above, and is clearly distinguishable from Gephart, in which "[Gephart] testified that he had authority to initially determine which creditors would be paid in that he 'reviewed the accounts payable and worked with Cheryl [Goebel] to determine which checks needed to be paid, and then ... turned the checks over to Mr. Bosset for ... his approval to mail.' " 818 F.2d at 474. McGlothin v. United States, 720 F.2d 6 (6th Cir.1983), also lends no support to the government's contention that in this case the facts clearly favor it because McGlothin affirmed a jury's factual determination of responsibility but did not indicate what the jury found.
 
 
 30
 Calderone v. United States, 799 F.2d 254 (6th Cir.1986), cited by the government, is distinguishable as well. There the court remanded to the district court because it had erred in assigning the burden of proof to the government and in granting summary judgment against the government. The court did not intimate as to the case's ultimate outcome but did note that the facts clearly indicated that "Calderone served as president, general manager, treasurer, and chairman of the board of directors" of the relevant corporation with "authority to direct which creditors of the corporation would be paid and when they were to be paid." 799 F.2d at 255. If not completely different from those at issue, Calderone's facts certainly are not sufficiently similar to support a JNOV.
 
 
 31
 Finally, the government cites Commonwealth Nat. Bank of Dallas v. United States, 665 F.2d 743 (5th Cir.1982) and Pacific Nat. Ins. Co. v. United States, 422 F.2d 26 (9th Cir.), cert. denied, 398 U.S. 937 (1970), for the proposition that creditors may be responsible for payment of corporate taxes if they exercise power to determine whether these taxes are paid. In both of those cases the courts held bank officers liable as responsible persons for the failure of one of their corporate customers to pay withholding taxes. But in both of those cases the creditors' officers conceded that they actually worked closely with the failing companies' management deciding which creditors to pay while knowing and allowing unpaid payroll taxes to accumulate. The only issue those cases addressed was whether "outside" persons not actually officers, directors, or employees of the delinquent corporation could nonetheless be held responsible because they exercised the corporation's power to pay over the withheld tax.
 
 
 32
 Clouse did not work closely with any financial aspect of OCTRA. The only evidence that he ever directed a payment as a creditor, to a creditor, came from the assignment to him of a government contract. The government has cited no authority to indicate that a creditor who seeks payment can be held liable merely because the creditor does not allow the government to be first in line. The operative law continues to require that such a person have "power to determine whether ... taxes are paid." In this case, when the facts in evidence are properly viewed in Clouse's favor, as they must be for purposes of determining the propriety of a j.n.o.v., they compel the conclusion that the jury's verdict was not unreasonable as a matter of law.
 
 
 33
 REVERSED.