Andrew B. HEIMARK, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 213–87 T.

United States Claims Court.

Aug. 18, 1989.

See also 14 Cl.Ct.643.

Edward I. Foster, Philadelphia, Pa., for plaintiff.

William K. Drew, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In 1982, the Internal Revenue Service (IRS) assessed a penalty of $68,513.78 against Andrew B. Heimark (plaintiff) for failure to pay the employment taxes of Getting Services, Inc. (GSI or corporation) during 1979. Plaintiff paid $350.94 of the penalty in 1986 and now seeks a refund of that amount. Defendant has counterclaimed for the unpaid balance of the penalty assessed under Section 6672 of the Internal Revenue Code (IRC), 26 U.S.C. § 6672(a) (1982 & Supp.1985).

After a trial held on May 22, 1989, this court determines that plaintiff was not responsible for collecting, truthfully accounting for, and paying GSI's payroll taxes. Therefore, this court denies defendant's counterclaim for more than $68,000.00 in penalties. Moreover, the IRS must refund to plaintiff that portion of the penalty already paid.

## FACTS [1]

In 1973, Jacob V. Heimark, plaintiff's father, and Jan P. Getting founded GSI. GSI developed custom-made software. With GSI's software, a business could manage its receivables, billings, and general ledger out of a single computer. Additionally, GSI distributed Digital Equipment Corporation products.

Early in 1978, the firm employed about fifteen individuals in modest offices in Wayne, Pennsylvania. Transcript of Proceedings, No. 213–87 T, filed June 15, 1989, (Tr.) at 39, 97. Jan Getting—co-founder and owner of almost half of GSI's stock—was then President of the enterprise. He was the primary manager and day-to-day decision-maker for GSI. Jacob Heimark owned almost half of GSI's stock and acted as Chairman of the GSI Board of Directors (Board) and Secretary. Tr. at 261. Either

Jan Getting or Jacob Heimark signed checks for GSI. Tr. at 62.

Upon incorporation, both Jan Getting and Jacob Heimark had given nominal amounts of stock to members of their immediate family. Each of Jacob Heimark's five children, including plaintiff, had a thousand shares of GSI stock in 1979. Similarly, Jan Getting's brother, Frank, owned five thousand shares. Tr. at 46.

GSI was a small, two-family operation. Tr. at 232. The business also supplied employment opportunities for members of the families. GSI employed Jan Getting's brother, Frank. In December 1977, plaintiff joined GSI as a low-level employee. Tr. at 57. Until March 1978, Getting was solely responsible for the day-to-day management of the firm. Jacob Heimark held a full-time job with Wharton Econometrics and devoted very little time to the management of the business.

In March of 1978, personal tragedy struck Jan Getting. Getting's wife eloped with his brother, Frank. This incident caused Getting to suffer an incapacitating affliction of alcoholism and a nervous disorder. Early in 1979, Getting spent three months in the hospital. Tr. at 218. He was unable to continue management of the business. Tr. at 204.

GSI desperately needed a top manager. Jacob Heimark could not leave his full-time job. Plaintiff was a young assistant—not a decision-maker. In this desperate atmosphere, Jan Getting quickly turned the firm over to Paul Monahan before his breakdown. Tr. at 54, 204, 234, 244.

Paul Monahan was an ex-Marine. He had allegedly received decorations for valorous military service. He also claimed to have earned a law degree from Georgetown University Law School and to have worked as a Special Assistant for IBM's top executive. Tr. at 221–22. Monahan originally became affiliated with GSI when he gave the firm a lead that produced a major client. Tr. at 42. By 1977, he was a

---

**1.** In light of the fact-intensive nature of this case, this court provides citations to the transcript in its recitation of the facts. These citations are not necessarily the only testimony given on each referenced point.

particularly successful salesman for GSI.[2] This sales record, with his prior IBM experience, made him a candidate to succeed Getting at a time of need. Tr. at 43, 243–44.

A particularly credible witness, long-time GSI employee Herbert G. Haines, described Monahan as an oppressive manager. Tr. at 201. Monahan maintained rigid discipline with verbal threats and physical intimidation. Tr. at 201, 203. In fact, he threatened to "take [employees] out in back of the building and teach some manners...." Tr. at 203. Monahan also drank excessive amounts of alcohol. Tr. at 201–02. He often returned from lunch intoxicated. When drunk, which occurred regularly, Monahan became even more oppressive and belligerent. Tr. at 202–03.

Plaintiff joined GSI in December 1977 at the age of 29. Before joining GSI, plaintiff had worked a little less than a year as a Management Trainee with Dun and Bradstreet Corporation, and for about four years as an Auditor at Ingersoll Rand Corporation. Plaintiff's primary skill in these jobs was his proficiency in the Spanish language on Latin American projects. Tr. at 89–90. These prior jobs did not entrust plaintiff with significant management or accounting responsibilities. *Id.* Plaintiff held a B.A. degree in Spanish and Education from St. Olaf College and a Master of International Management degree from Thunderbird Graduate School.

Plaintiff joined GSI as Office Manager. Tr. at 57, 91. Jacob Heimark and Jan Getting envisioned training plaintiff to accept future responsibilities in customer relations. Tr. at 57, 231–32. Initially plaintiff learned from his father to collect bills and keep the books for GSI.

After a few months, the Board created the position of Comptroller. By a January 30, 1978 letter, Jan Getting offered plaintiff that position. The Board stated the Comptroller's duties:

He shall be responsible for maintaining a current and continuing picture of the financial condition for the company and the cash flow requirements to meet the ongoing obligations of the Corporation, along with such other duties as may be assigned by the President or the Executive Vice President.

The Comptroller was not an officer in the corporation, but an employee just above the Property Manager. Tr. at 60. This position carried an annual salary of $18,000.00. In 1979, plaintiff received "take home" pay of approximately $11,506.65. Exhibit (Ex.) O.

At the time that the Board created the Comptroller position, it also created the position of Executive Vice President. This position ranked higher than the Comptroller. The Executive Vice President had the assignment of making on-the-spot decisions when the President was not available. Tr. at 59–60. Mr. Gary Boyles filled this position.

On March 22, 1978, due to the pressing circumstances, Paul Monahan became President of GSI and a major stockholder. The Board granted Monahan 30,000 shares of stock, making him almost a one-third owner of the business with Jan Getting and Jacob Heimark.[3] Tr. at 47. As President, Monahan received full authority to run the company on a day-to-day basis. Tr. at 50, 52, 228, 244.

As with traditional corporate management schemes, GSI's organization envisioned that the Board would serve as a check on Monahan's authority. In fact, however, this check was almost nonexistent because the other two Board members were rarely present. Tr. at 228–29. Getting was in the hospital, or otherwise incapacitated. Jacob Heimark was busy with another full-time job and often abroad for weeks and months at a time. Tr. at 75–76. The entire Board consisted of Jan Getting, Jacob Heimark, and Paul Monahan.[4] In

---

2. GSI offered Monahan the position of "marketer" with a 7½% percent commission and an option for 50,000 shares. Exhibit H.

3. Plaintiff at all times covered by this suit held less than 1% of GSI's stock. Stipulation, ¶ 20, Exhibit P (Stip.).

4. Plaintiff never served as a member of the Board. Stip. ¶ 25. In fact, plaintiff only attend-

sum, Monahan had a free hand to run GSI. Tr. at 230.

In the absence of any check, Monahan drew out of the company $165,000.00 in less than a year and a half. Tr. at 81. Monahan's authorized annual salary was $50,000.00.[5] Discovery of these excesses led to Jacob Heimark's resignation from the Board. *Id.*

At the time Monahan became President, the Board appointed plaintiff Treasurer of GSI. Plaintiff received no compensation for serving as Treasurer. Tr. at 101. Plaintiff was not present when elected Treasurer and received no advice from Monahan or any other officer about the duties of that office. Tr. at 135–39. Plaintiff learned the duties by reading the position description created by the Board in 1974:

> The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation. . . . He shall disburse the funds of the corporation *as may be ordered* and shall render . . . reports on the financial condition of the corporation. . . .

Stipulation, (Stip.) ¶ 29, Exhibit P (emphasis added).

Monahan dominated plaintiff. Plaintiff could do very little without permission from Monahan. In fact, plaintiff testified that he never said "No" to Monahan on anything. Tr. at 129. In the words of Herbert Haines, plaintiff "was more of a clerk than anything else. Like the rest of us, he took his orders from Monahan." Tr. at 206.

Monahan had even taken steps before becoming President to ensure that plaintiff would understand his subservient position. On March 10, 1979, just before transfer of power, Getting issued a letter directed to plaintiff. Monahan prepared the letter and convinced Getting to sign it. Tr. at 237–40.

The March 10 letter secured the authority of the President of GSI to approve all payments:

> To: Andrew Heimark.
> As of today payment of all payables are to be approved by me. No payments are to be sent without my specific approval. As of today I want a written report of our cash position giving a bottom line of cash available and accounts payable broken down by current and past due submitted to me every Friday.

Within two weeks of the issuance of this letter, Monahan became President. He demanded compliance with the policy found in the March 10 letter. Plaintiff met with Monahan twice a week in compliance with this directive. Tr. at 109.

The association between plaintiff and Monahan was even more complex than traditional supervisor-to-employer relations. When Monahan became President, Jacob Heimark questioned the move. Jan Getting testified that Jacob Heimark feared that Monahan might "rob the place or take control" of the operation. Tr. at 234. These questions created friction from the outset between Paul Monahan and Jacob Heimark. *Id.* Business relations between the two became strained. Stip. at ¶ 68. This estrangement between Monahan and plaintiff's father affected relationships between Monahan and plaintiff as well. Tr. at 234–35.

Meantime, as Monahan's drinking problem progressed, plaintiff advised Monahan's secretary to hide afternoon phone messages until the following morning to prevent Monahan from returning calls when intoxicated. Stip. at ¶ 60. On some occasions, Monahan's secretary would decide on her own to hide the messages. Tr. at 158. Ebling and Royce—one of GSI's most important clients—barred Monahan from its premises due to embarrassing incidents related to his drinking. Tr. at 160–61. Monahan's drinking, however, only emboldened his will to command. Tr. at 202.

---

ed Board meetings to report on finances as ordered by Monahan.

**5.** However, Monahan, without Board approval, raised his own salary to $55,000.00 Tr. at 69.

In sum, plaintiff's actual authority at GSI was very limited. Plaintiff made no memorable decisions during his tenure at GSI. Tr. at 58–59, 130. Plaintiff supervised no employees other than, to a limited degree, a secretary he shared with Monahan. Tr. at 59, 104. Plaintiff did not hire or fire any employees at GSI, nor recommend such a personnel action. Tr. at 102. Plaintiff negotiated no bank loans or contracts. Tr. at 102, 130. Plaintiff made no expenditure, without Monahan's approval, above $25.00 in automobile expenses. Tr. at 102–03. Plaintiff purchased no office supplies as menial as pens and paper without Monahan's approval. Tr. at 144. Plaintiff paid no creditors without Monahan's approval. Tr. at 114–15, 244. Plaintiff prepared no checks without Monahan's approval. Tr. at 117, 130. Plaintiff mailed no checks without Monahan's approval. Tr. at 126, 132.

With respect to payment of taxes, plaintiff's authority was similarly limited. As 1979 progressed, plaintiff learned that GSI had not paid its federal taxes. GSI was often behind in meeting its tax responsibilities. In May 1979, GSI had yet to pay its 1978 taxes. Tr. at 95. As more deadlines passed, plaintiff advised Monahan regularly of GSI's tax obligations. Tr. at 126–27, 184–87. At length, plaintiff suggested to Monahan that GSI should use employee payroll funds to pay taxes. Tr. at 94–95. When Monahan refused, plaintiff resigned his position in September of 1979. *Id.*

Plaintiff had authority, along with Monahan and Boyle, to co-sign GSI checks. When Getting and Jacob Heimark ran the company together, either could alone sign GSI checks. Tr. at 62. Monahan changed this policy to require two signatures on GSI checks. Tr. at 66–67. Monahan made the change to gain "closer control over expenditures." Tr. at 67. Under the new policy, the President (Monahan), the Executive Vice President (Boyles), and the Comptroller (plaintiff) could sign checks, but each check required two signatures. Stip. at ¶ 55.

GSI policies also limited plaintiff's check-signing authority. Plaintiff prepared and signed checks as ordered by Monahan.[6] Tr. at 116–17. Then plaintiff presented those checks to Monahan. Monahan would then decide whether to countersign these checks which he had ordered plaintiff to prepare and sign. Occasionally Monahan would refuse to sign a check he had earlier ordered plaintiff to draft. Tr. at 117. Monahan tightly controlled the issuance of each check.

During plaintiff's tenure at GSI, accountants Cionci and Mazen prepared the firm's Form 941 employment tax returns. Although signing the forms for the first and second quarters of 1979, plaintiff did not prepare these returns. Tr. 105, 150–51. These accountants maintained the payroll records for GSI at their offices. Tr. at 151–52. In fact, when Haines had questions about his tax liabilities, he went directly to Cionci and Mazen's offices to consult GSI's payroll records.[7] Tr. at 210. Plaintiff advised the accountants of any arriving or departing employees and Cionci and Mazen advised plaintiff of the amount of their paychecks. Tr. at 152. Plaintiff's role in payroll and tax preparation was again very limited.

Herbert Haines corroborated much of this testimony about the extreme limitations on plaintiff's authority and duties in the GSI office. For instance, Haines testified from his personal experience that plaintiff prepared no checks without Monahan's approval. Tr. at 206–07. Haines further confirmed that plaintiff never authorized the expenditure of funds. Tr. at 209. Haines also verified that plaintiff did not exert supervisory authority over other employees. Tr. at 208–09. He summed up his

---

6. Plaintiff prepared most GSI checks under Monahan's strict supervision. In some instances, Monahan personally prepared checks and presented them to Boyles for co-signature. Stip. at ¶ 57. Some checks were signed by plaintiff and Boyles without Monahan's signature. Stip. at ¶ 58.

7. Cionci and Mazen erred in preparing Haines' W–2 form. Tr. at 210. These accountants also failed to issue plaintiff a W–2 form for 1979. Tr. at 119.

**20**

perception by declaring that plaintiff had "damn little" authority. Tr. at 207.

Jan Getting's testimony confirmed the same perception. In Getting's words, Monahan "had absolute control," (Tr. at 244), and "an absolute free hand." Tr. at 230. According to the previous President of GSI, Monahan "ran the show." Tr. at 228. Jacob V. Heimark made the same assessment, saying that Monahan "was in charge of everything going on at Getting Services." Tr. at 52. Jacob Heimark also said that Monahan had "full control ... [and] full responsibility for the revenues in terms of what to do with them and bills to be paid." Tr. at 50.

With regard to plaintiff, however, Jan Getting said, "Andy was like everyone else, [he did] whatever Paul [Monahan] decided." Tr. at 230.

Paul A. Monahan died in 1981. Stip. ¶ 36.

Based on these facts, defendant contends that plaintiff was a responsible person under § 6672 for the first three quarters of 1979. Defendant further argues that plaintiff willfully did not collect, account for, and pay GSI's employment taxes for the first three quarters of 1979. Defendant concedes that plaintiff had resigned prior to incurring any liability for unpaid taxes in the fourth quarter of 1979.

Plaintiff counters that he was not responsible under § 6672 for the period in question. Furthermore, plaintiff contends, he did not willfully disregard any § 6672 duties. Therefore, he rejects any liability for GSI's failure to pay 1979 taxes.

This court must determine whether plaintiff was a responsible person under § 6672 who willfully failed to perform the duty to collect and pay GSI's employment taxes. Plaintiff's payment of additional penalties, or entitlement to a refund, depends on the resolution of these issues.

## DISCUSSION

Section 6672(a) of the IRC imposes a tax penalty "equal to the total amount of the tax evaded" on:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof....

Section 6671(b) defines further the terms of § 6672:

The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

■ The Claims Court's predecessor explained the reason for this 100% tax penalty:

[E]mployees are entitled to credit for the amounts of FICA and income taxes withheld from their wages regardless of whether or not the employer turns the funds over to the Government. Since, therefore, the Government may actually be out-of-pocket by way of credit or refund for taxes it has never received, Congress has allowed the IRS more stringent protective devices to insure collection of payroll taxes than in the case of many other taxes.

*Bolding v. United States*, 215 Ct.Cl. 148, 157–58, 565 F.2d 663, 669 (1977) (citations omitted). An employer deducts and holds employment taxes in trust for the benefit of the United States. § 7501 of the IRC. Any person responsible for breaching that trust is subject to § 6672's tax penalty.

The United States Court of Appeals for the Federal Circuit has clarified that § 6672 imposes liability only if a taxpayer is found accountable under both of two statutory tests:

First, he must be under a duty to "perform the act in respect of which the violation occurs," and that duty is "to collect, truthfully account for, and pay over" any taxes. Such a person is a "responsible person." Second, the "responsible person" must have "willfully" failed to collect, truthfully account for, and pay over ... the tax....

*Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984) (citations omitted). This court must first determine if plaintiff was a responsible person within the meaning of § 6672.

### Responsible Person Test

■ The Federal Circuit's *Godfrey* decision sets forth in detail several factors for determining whether an individual is "actually responsible for an employer's failure to withhold and pay over the tax." *Godfrey*, 748 F.2d at 1574 (citations omitted). These factors fall into three general categories: status, duty, and authority. *See, e.g., Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983). Thus, any person with sufficient status, duty, and authority "to avoid the default" is a responsible person under § 6672. *Godfrey*, 748 F.2d at 1575; *White v. United States*, 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967). Accordingly, responsibility may rest with more than one employee or officer of a corporation that fails to withhold and pay employment taxes. *Godfrey*, 748 F.2d at 1574–75; *Scott v. United States*, 173 Ct.Cl. 650, 657, 354 F.2d 292, 296 (1965).

■ The determination of responsibility is a matter of substance, not merely form. *Godfrey*, 748 F.2d 1576. This court must carefully weigh the facts to determine if plaintiff had enough status, duties, and authority to constitute "the power to control the decision-making process by which the employer corporation allocates funds...." *Godfrey*, 748 F.2d at 1575; *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975). In other words, this court must ascertain if plaintiff had sufficient status, duties, and authority to be "a person with ultimate authority over expenditure of funds." *Godfrey*, 748 F.2d at 1575; *White*, 372 F.2d at 517. Individuals with such status, duties, and authority "can fairly be said to be responsible for the corporation's failure to pay over its taxes." *Godfrey*, 748 F.2d at 1575; *Barrett v. United States*, 217 Ct.Cl. 617, 624, 580 F.2d 449, 452 (1979) (citations omitted).

### Status

■ The Federal Circuit stated that status as a corporate officer alone is not a sign of sufficient status to avoid a default:

> [The trial court held that plaintiff's] *status* as chairman cum advisor-negotiator—and the respect and deference accorded that status—amounted to "ultimate authority" or "power to control" for purposes of § 6672. The case law will not support that holding.
>
> It is material, but not controlling....

*Godfrey*, 748 F.2d at 1575 (emphasis in original).

In the case at bar, plaintiff held the office of Treasurer in a very small and struggling company run by a single autocratic President. Plaintiff did not even receive compensation for serving as Treasurer. Rather, Jan Getting, the Chairman of the Board, viewed plaintiff's title as a "courtesy title" because a firm the size of GSI could not justify paying someone to serve in that role. Tr. at 233.

Plaintiff enjoyed no particular respect or deference amongst the employees of GSI by virtue of his title as Treasurer or his position as Comptroller. To the contrary, plaintiff supervised no one at GSI other than, to a limited degree, a single secretary. As discussed earlier, plaintiff alone authorized no expenditures, made no memorable decisions, issued no general orders, and exerted no particular influence over the course of events at GSI. Neither his uncompensated position as Treasurer nor his position of Comptroller, for which he received "take home" pay of $11,506.65 in 1979, conferred upon plaintiff a status to even significantly participate in, let alone control, the allocation of GSI funds.

### Duties

■ GSI's corporate by-laws and resolutions defined plaintiff's duties. The resolutions empowered plaintiff, in his capacity as Treasurer, to "disburse funds of the corporation *as may be ordered....*" Stip. ¶ 29. Plaintiff enjoyed no independent, ultimate, or even significant power to disburse funds. Rather GSI required plaintiff to disburse funds as ordered by the President. The President of GSI, in the unrefut-

ed words of the witnesses in this case, had full authority, absolute control, and a free hand. Plaintiff did not serve as the slightest check upon the President's authority to spend corporate funds. Only the Board of Directors provided a check, albeit a purely theoretical check, on Monahan. Indeed, checking Monahan or even participating significantly in expenditure of funds was not plaintiff's duty under the corporate resolutions. Plaintiff merely fulfilled his ministerial duty of disbursing funds as ordered.

As Comptroller, a position in which he served at the pleasure of the President, plaintiff had the following duties:

> He shall be responsible for maintaining a current and continuing picture of the financial condition for the company and the cash flow requirements to meet the ongoing obligations of the Corporation, along with such other duties as may be assigned by the President or Executive Vice President.

Stip. ¶ 30. This paragraph accurately describes plaintiff's duties. Plaintiff kept the corporate books up to date and reported twice weekly to Monahan. Monahan, in turn, made all decisions committing GSI funds. Plaintiff received his assignments and supervision from Monahan. In Herbert Haines' words, plaintiff served as "more of a clerk than anything else." Tr. at 206.

Plaintiff's written duties in the corporate by-laws do not disclose any power to control expenditures. These written duties operated in practice as well. On March 10, 1978, plaintiff received a letter from the President (at that time, Jan Getting) further outlining his duties:

> As of today, payment of all payables are to be approved by me. No payments are to be sent without my specific approval.

Monahan, who succeeded to the presidency within two weeks of this writing, prepared this document. Monahan demanded compliance with this policy. Plaintiff could not even buy stationary without Monahan's approval. Control over the allocation of funds was simply not within plaintiff's job description. Plaintiff acted at all times within the strictly limited bounds of his job.

Defendant contends that plaintiff's duty to co-sign checks gave him "a significant measure of control over the disbursal of GSI's funds." Def.Br. filed June 22, 1989, at 15. However correct as a theoretical proposition, the facts presented at trial refuted this assertion and argument. Plaintiff had no control over the disbursal of GSI's corporate funds. Although GSI checks required a second signature (either plaintiff's or Boyles') Monahan made all decisions on payment of creditors, including payment of taxes.

Among plaintiff's duties was the preparation of checks. Monahan told plaintiff which checks to draft and then only endorsed those he alone decided to send. Under Monahan's policies, plaintiff automatically signed all checks that he drafted and presented to Monahan for final approval. At no time did plaintiff have, or feel he had, the power to refuse to follow Monahan's instructions in check preparation and endorsement. He never had, nor felt he had, the authority to say "No" to a payment. Tr. at 128–29. The corporate by-laws did not grant plaintiff power to question Monahan's spending decisions. Moreover, the March 10, 1978 letter further clarified that plaintiff had practically no authority over expenditures. All payments needed Monahan's approval. And Monahan tolerated no challenges to his absolute authority. Plaintiff's duty to co-sign checks was a ministerial task—with the same significance in GSI's operations as placing endorsed checks in envelopes and mailing them. Yet even these ministerial tasks required Monahan's approval. Tr. at 117.

Defendant places undue weight on plaintiff's co-signing duty. The Federal Circuit stated:

> The mechanical duties of signing checks and preparing tax returns are thus not determinative of liability under § 6672.

*Godfrey,* 748 F.2d at 1575. Moreover, the Claims Court's predecessor agreed:

Case law discloses that authority to sign checks, without more, is a weak pillar on which to rest a liability determination that a person is properly subject to a 100 percent penalty under section 6672.

*Barrett*, 580 F.2d at 453.

Defendant cites *Burack* and *Bolding* for the proposition that "an individual with authority to sign checks on a corporate account that requires two signatures generally has sufficient authority over corporate finances to be a responsible person." Def. Br., filed June 22, 1989, at 18. This court generally agrees with that proposition. The operative word, however, in both the proposition and this court's statement of agreement is "generally."

The *Burack* and *Bolding* cases themselves illustrate some of the additional indicia of authority that must accompany check signing powers to establish § 6672 responsibility. In *Burack*, the co-signer was also a one-sixth shareholder, a co-founder, a vice-president, a director on the corporate board, and an individual determined by the Court of Claims to be "the corporation's principal officer and employee ... [who] was in general charge of the corporation's operations." *Burack v. United States*, 198 Ct.Cl. 855, 859–60, 461 F.2d 1282, 1286 (1972).[8] Thus, this individual clearly had significant authority to control finances beyond the co-signing duty. In the case at bar, plaintiff was a less than one percent shareholder in a tiny firm, a barely thirty-year-old bookkeeper, a Treasurer in name only, and an individual utterly lacking in actual or apparent capacity to make any corporate decisions, let alone decisions allocating funds. Beyond a ministerial co-signing authority, plaintiff in the case at bar possessed no authority to control expenditures.

In *Bolding*, the co-signer was also a certified public accountant, a vice president for finance, secretary and treasurer, director on the corporate board, involved in authorizing and requesting issuance of checks, and determined by the Court of

Claims to be an individual whose "authority over the financial affairs of Gulf increased with the passage of time," *Bolding*, 565 F.2d at 668, and who "exercised ... authority over disbursements and payment of creditors." *Id.* Once again, the plaintiff in *Bolding* possessed considerable authority and power beyond co-signing duties. None of these additional trappings or appearances of power accompany the plaintiff in the case at bar.

In sum, the duty of co-signing checks carries considerable weight in § 6672 cases, but that alone does not establish responsibility. Where, as in this case, a taxpayer had little or no decision-making power beyond the ministerial duty of co-signing checks, a court cannot justifiably conclude that the individual controls the allocation of funds or possesses significant authority over expenditures.

*Authority*

The Federal Circuit has also clarified the authority question:

[A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held "responsible."

*Godfrey*, 748 F.2d at 1576 (citations omitted). This passage emphasizes several factors about the test for adequate authority to show responsibility under § 6672. In the first place, the test is one of substance, not form. The inquiry must focus on actual authority to control, not on titles or trivial duties. In the case at bar, plaintiff had a courtesy title, but no authority to control disbursements or voting stock.

The passage from *Godfrey* also illustrates that a combination of indicators usually accompanies actual authority.

---

**8.** The Court of Claims further found: "Plaintiff [Burack] was an influential, active, officer in determining the corporation's financial policies and procedures." *Burack v. United States*, 198 Ct.Cl. 855, 871, 461 F.2d 1282, 1287 (1972).

**24**

Though conceivable perhaps, actual authority is rarely found in a single duty. In the case at bar, for example, plaintiff's authority to sign checks alone disclosed no actual authority over expenditures. Plaintiff could not even prevent the issuance of checks by denying his signature. Monahan could, and did, secure a second endorsement by taking checks to plaintiff's immediate superior, Boyles.

■ As suggested by the Federal Circuit, a combination of indicators usually accompanies the actual authority sufficient to confer § 6672 responsibility. Some of these indicators include power to disburse the payroll, power to vote significant blocks of stock, power to supervise employees, power to make corporate decisions, power to enter contracts, power to sway the corporate board, or power to prepare corporate tax strategies, to name a few. All of these aspects of authority need not be present to establish § 6672 liability; some combination will generally show actual and sufficient authority for the tax penalty.

■ Beyond a ministerial co-signing duty, plaintiff possessed and exhibited no other aspects of actual authority. GSI's accountants kept the corporation's payroll and tax records. Cionci and Mazen also prepared the corporate tax return. Plaintiff did not participate in any significant way in the preparation of any corporate finance or tax strategies. As the witnesses stressed, plaintiff was a clerk, not a decision-maker. *See, e.g.*, Tr. at 206.

In sum, plaintiff had neither the status, the duties, nor the authority sufficient to show responsibility for violation of § 6672. Although more than one employee or officer within a corporation may be responsible for a § 6672 violation, *Scott*, 354 F.2d at 296,[9] plaintiff was not one of the individuals responsible for GSI's failure to pay employment taxes.

### Willfulness Test

■ Because plaintiff was not responsible for GSI's failure to pay taxes, this court need not examine in detail whether he willfully caused the default. The Court of Claims defined a willful act under § 6672 as a "deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government." *White*, 372 F.2d at 521. The Claims Court's predecessor further explained:

> [I]t is not necessary that there be present an intent to defraud or to deprive the United States of taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness.

*Id.*

The primary focus of this test is upon the taxpayer's diligence in attending to the duty to pay employment taxes. By undertaking all reasonable efforts to fulfill that duty, a taxpayer can show that he did not willfully neglect his duty.

Under the strict limitations of his position, plaintiff in the case at bar undertook all reasonable efforts to see that GSI paid its taxes. Plaintiff repeatedly reminded Monahan of the deficiency. Plaintiff tried to suggest to Monahan strategies to pay the taxes despite GSI's financial difficulties. For instance, plaintiff suggested skipping the payroll for a month to pay the over-due tax. Plaintiff informed the Board of the tax deficiencies. At length, when Monahan refused plaintiff's suggestions for payment of the tax, plaintiff resigned. Tr. at 95–96.

Plaintiff's reasonable efforts took place within the space of a few months. Plaintiff did not tolerate a prolonged period of tax evasion. GSI was typically behind in

9. In the *Scott* case, the Court of Claims found more than one individual liable for a § 6672 infraction. Nonetheless, the "other" officer held responsible in *Scott* was an incorporator, a director on the corporate board, secretary-treasurer, and determined by the court to have "general authority to sign a wide variety of corporate documents (including tax returns), to draw checks on the corporate bank account, and to make financial decisions respecting financial difficulties arising in the ordinary course of business...." *Scott v. United States*, 173 Ct.Cl. 650, 656–57, 354 F.2d 292, 295 (1965). Plaintiff in the case at bar does not come close to exhibiting such actual authority.

paying taxes. Nonetheless, when GSI fell behind in paying taxes for the first quarter of 1979, plaintiff began to raise concerns as best he could within the strictures of his position. When the deadline for the second quarter passed, plaintiff tried to suggest drastic measures to pay the tax. Plaintiff resigned before the third quarter of 1979 ended.

Moreover, the Federal Circuit stated:

Willfulness must also be viewed in light of the "personal fault" of the plaintiff: "[t]he fact that the provision imposes a 'penalty' and is violated only by a 'willful failure' is itself strong evidence that it was not intended to impose liability without personal fault."

*Godfrey*, 748 F.2d at 1577 (citations omitted). Taking into consideration the limits of plaintiff's authority and his efforts to encourage his superiors to satisfy GSI's tax obligations, plaintiff was not personally at fault for the failure to pay taxes.

Plaintiff enjoyed very little actual authority within GSI. In light of his limited authority, plaintiff undertook all reasonable efforts in a timely fashion. Therefore, plaintiff did not willfully fail to collect, truthfully account for, and pay over GSI's taxes.

## CONCLUSION

Because he had trivial status, limited duties, and little actual authority, plaintiff was not responsible within the meaning of § 6672. Plaintiff was a bookkeeper and clerk with the uncompensated courtesy title of Treasurer. Plaintiff did not control GSI's financial processes, nor exercise authority over expenditure of GSI funds. Moreover, by undertaking all reasonable efforts within the limits of his authority to see to the payment of taxes, plaintiff did not willfully fail to fulfill any duty under § 6672.

Plaintiff is entitled to a refund of that portion of the tax penalty he has already paid. Therefore, this court directs the Clerk to enter judgment in the amount of $350.94, plus interest, for plaintiff. This court denies defendant's counterclaim.

No costs.

IT IS SO ORDERED.