**Richard G. DE ALTO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–4T.**

United States Court of Federal Claims.

May 13, 1998.

---

Raymond T. Lyons, Roseland, NJ, for plaintiff.

Edward L. Froelich, U.S. Department of Justice, Washington, DC, with whom were Assistant Attorney General Loretta C. Argrett, Chief Mildred L. Seidman, and Assistant Chief David Gustafson, all of U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff Richard G. De Alto seeks to recover his 1992 personal income tax refund withheld by the United States and to abate an assessment of taxes and penalties against him. Defendant counterclaims for the unpaid balance of that assessment. The sole issue at trial was whether and to what extent plaintiff was a "responsible person" under 26 U.S.C. § 6672 (1994). The court has juris-

diction over this matter pursuant to 28 U.S.C. §§ 1346(a)(1), 1491, 1503 (1994). Trial was held in New York City on March 9–11, 1998.

## BACKGROUND

The facts in this case revolve around the failure of Precision Technology, a New Jersey corporation, to deposit with the Internal Revenue Service (IRS) payroll taxes collected from Precision's employees during the second half of 1990 and all of 1991. Precision is a manufacturer and supplier of components for orthopedic implants. During the withholding period at issue, it owned a separate division, Acculab, which sold certain histology and hematology products to clinical labs, including testing kits. The company employed over fifty employees, approximately ten to fifteen in the administrative area and forty to fifty in manufacturing operations. The president and primary stockholder of Precision was, and still is, Ira Housman.[1]

Plaintiff was hired as the controller for Precision in December 1985 by Mr. Housman. As controller, plaintiff supervised an accounting staff whose duties included collecting and paying federal employment taxes and filing related tax forms.[2] Plaintiff was promoted to vice-president and general manager of Precision in April 1987. According to an interoffice memorandum from Mr. Housman, plaintiff "will represent [Mr. Housman] at [Precision] when [Mr. Housman is] not present, with full authority to use his discretion and judgement [sic] over all matters."

(See Def.'s ex. 5.) It is undisputed that plaintiff's authority grew after he was promoted. As vice-president and general manager, plaintiff was responsible for running the office operations, including approximately ten to fifteen employees in the accounting and reception areas.[3] Plaintiff became responsible for the daily operations of the office. This included making limited hiring and firing decisions, negotiating and entering contracts on behalf of the company, and ensuring that the daily office operations of the company ran smoothly. On at least one occasion, plaintiff assisted an outside consultant in preparing a financial statement and an accounting review. Plaintiff was also responsible for keeping a record of the accounts payable.

Plaintiff and others testified that Mr. Housman kept a tight rein on company operations as far as finances were concerned. Mr. Housman insisted on final approval for all accounts-payable decisions. Witnesses testified to meetings with Mr. Housman in which he reviewed debts that were coming due and decided which debts were to be paid and which were to be ignored. These meetings were typically attended by Mr. Housman, plaintiff, and Kip De Boer, Precision's accounting manager and controller until June 1991. Plaintiff testified that Mr. Housman would instruct him to pay certain debts over others. This testimony contradicts that of Mr. Housman, who testified that plaintiff assumed a more responsible role and had full authority to pay debts without Mr. Housman's knowledge or approval.[4] The testimo-

---

1. There was a dispute at trial regarding the extent of stock ownership in Precision by Mr. Housman. Whether Mr. Housman was the primary or sole stockholder is not relevant to the issues in this matter.

2. On at least two occasions, plaintiff signed the Form 941 payroll tax form for the company.

3. There is some dispute over the extent of plaintiff's control over the manufacturing operations of Precision. The court notes that his control over the manufacturing operations is not relevant; what is relevant was his control over the ability to pay the debts of the corporation, including payroll taxes.

4. Mr. Housman did not appear at trial. Due to Mr. Housman's illness, the parties agreed to sub-

mit his deposition transcript in lieu of his testimony. The parties were given an opportunity before the close of evidence to request reissuing a subpoena for Mr. Housman. Both parties declined to take that opportunity. The court is left with no choice but to judge the deposition testimony against the testimony at trial. While his deposition testimony contradicts much of what plaintiff asserted at trial, the court does not find his deposition testimony credible. It is obviously self-serving; displacing the blame for Precision's financial woes would allow Mr. Housman to potentially minimize civil liability. Plaintiff's testimony is also subject to the same criticism, but of the two versions of events, plaintiff's is supported by the testimony of other witnesses, specifically Mr. De Boer and Mr. DePretto, while Mr. Housman's is not. In addition, plaintiff's version of many facts is supported by documen-

ny of other employees, however, strongly indicates that, Mr. Housman painted an inaccurate and unduly modest picture of his involvement. In fact, he exercised almost exclusive control over the company's financial affairs.

On March 3, 1990, Mr. Housman circulated a memorandum to plaintiff and Mr. De Boer, the controller at the time. This memorandum outlined the review of "all financial matters." (*See* Pl.'s ex. 1.) Mr. Housman instructed plaintiff and Mr. De Boer that he wanted daily, weekly, and monthly reports and specified their contents. He set a schedule for meetings between the himself and the other two. These were the same meetings in which pending accounts payable were discussed. Weekly reports were to contain information on cash flow and creditor payment schedules, including payroll and payroll taxes. The memorandum also provided a list of matters that demanded "immediate" attention according to Mr. Housman. The list consisted of creditors and administrative matters and was numbered from one to eighteen. For example, item number fifteen stated: "Review my Sch. of Payments: Must sent [sic] Mark—Wilson Elser at least $5000." [5] Item number eighteen stated: "Keep me posted on Payroll Taxes." The procedures outlined in the memorandum were to "take place immediately" according to the memorandum. The daily reports he demanded were detailed lists of orders taken, checks written, and shipments for the day. Those reports also were to inform Mr. Housman of calls that were not returned during that day.

In his March 1990 memorandum, Mr. Housman directed: "No checks signed except by me[. I]f for some reason [a check] must go out [and] I am not here-okay. [A]ll checks copied for daily cash report—no matter who signed them." This is consistent with plaintiff's claim that he was authorized to sign checks for bills without Mr. Housman's authorization only in emergencies when Mr. Housman was not available. These emergencies were situations where operations would be completely shut down if the bills were not paid, for example, when the electric company threatened to cut power to the building because of a past-due bill. If Mr. Housman was not present, plaintiff could cut a check on the spot. Indeed, it is clear from the record that plaintiff signed a few of such checks. Some of the emergency checks were used to transfer money from National to Midlantic for paying arrears on payroll taxes.[6]

The company maintained separate checking accounts at two different banks, Midlantic National Bank and United Jersey Bank. The Midlantic account was the company's general account. The United account was the company's payroll account. Mr. Housman, his wife, and plaintiff were the authorized signors on the Midlantic account. Plaintiff did not have signature power on the United account. Sometime in 1991, the payroll account was transferred to National Community Bank from United.[7] Plaintiff testified that this was done specifically to impede the IRS's ability to levy against the company's assets. It is unclear whose idea this was. Whenever funds were necessary to pay the IRS or other creditors, money was transferred from the National account to the Midlantic account.[8] Mr. Housman and plaintiff were the authorized signors on the National account.

---

tary evidence, such as the March 1990 memorandum; Mr. Housman's is not.

5. This item refers to Mr. Housman's son, who was an attorney for a law firm that did some work for Mr. Housman and Precision. That law firm was a creditor of Precision.

6. There were two checks that did not appear to be emergencies on their face. Plaintiff claims that he was instructed by Mr. Housman to sign these checks because the creditors were friends of Mr. Housman.

7. Plaintiff testified that United was no longer interested in keeping the company's payroll account because of the frequent difficulties the company was having with the IRS levying on the funds.

8. This ploy was successful. Ms. Gertrude Maughen, the IRS contact responsible for tracking Precision's arrears, testified that she was unaware of the existence of the National account.

Precision was in financial trouble throughout the period at issue, and for some time before. The company regularly had problems paying all its creditors, including the IRS.[9] For this reason, the payment of creditors was a process of prioritization. All bills were matched with appropriate purchase orders and filed by payment due date by the accounting staff. A list of bills would then be presented to plaintiff, who met with Mr. Housman. Plaintiff and Mr. De Boer would sometimes lobby for individual creditors; the actual decision on who would be paid, however, was Mr. Housman's. Once Mr. Housman had made his decision regarding which creditors to pay, the checks were prepared by the accounting department and reviewed by plaintiff. By initialing the top left corner of the check, plaintiff indicated that he had reviewed the billing file for a particular bill. They were then forwarded to Mr. Housman for signature. According to plaintiff, anyone, including himself, who paid bills without Mr. Housman's authority would be subject to dismissal.

Since 1985, according to IRS records, Precision had had repeated problems paying its federal payroll taxes. On March 26, 1990, the IRS assigned Precision a taxpayer delinquency account. Gertrude Maughen was the IRS revenue officer with whom Precision kept in contact regarding the tax arrears at issue here.[10] Ms. Maughen testified that she initially dealt with plaintiff concerning the tax arrears.[11] Plaintiff testified that he personally dealt with the IRS at the time because Mr. Housman instructed him to do so. On January 30, 1990, plaintiff visited the IRS offices to discuss the tax bills for the first three quarters of 1989. Plaintiff represented that the payroll taxes for the first quarter of 1990 were on schedule. He also stated to Ms. Maughen that he had the authority to discuss tax matters for Precision and that he was in charge of financial matters at Precision. In April 1990 the IRS demanded a schedule of payment to bring the 1989 tax arrears up to date. According to plaintiff, Mr. Housman agreed to this schedule. Beginning in July 1990, Ms. Maughen began dealing with Mr. De Boer instead of plaintiff. Between January 1990 and March 1991, Precision was consistently behind in its payroll tax obligations to the IRS.

On March 8, 1991, Precision received a letter from S. George Greenspan, an attorney licensed to practice in New Jersey. The letter was a solicitation addressed to Precision generally regarding the company's current federal tax problems. At the time, the IRS had levied on Precision's bank accounts several times to cover delinquencies in paying arrears for 1989, as well as then-current tax obligations. Plaintiff set up an appointment with Mr. Greenspan to discuss the tax situation with Mr. Housman. Mr. Greenspan met with Mr. Housman, plaintiff, and Mr. De Boer. Mr. Housman retained Mr. Greenspan sometime after the meeting to negotiate with the IRS on behalf of Precision. On April 10, 1991, both Mr. Greenspan and plaintiff met with Ms. Maughen to discuss Precision's tax situation. Ms. Maughen testified that plaintiff represented to her that he was authorized to discuss tax matters on behalf of Precision. According to her, Mr. Greenspan did most of the talking during the meeting. On April 18, 1991, in a telephone conversation with Mr. Greenspan, Ms. Maughen demanded that Mr. Housman file a personal financial statement before any payment agreement could be negotiated.[12]

9. There were many factors that contributed to Precision's inability to pay creditors. One reason was the drain on the company's assets imposed by Mr. Housman's extensive shareholder loans. As of June 30, 1991, Mr. Housman had received advances from the corporation totaling $654,356.95. Of that amount, only $68,847.48 had been repaid as of June 30, 1991.

10. A large portion of Ms. Maughen's testimony was based on an IRS document containing her recorded recollection of actions taken on Precision's account. That document contains statements recorded by Ms. Maughen and contemporaneous with actions taken on Precision's account between March 26, 1990, and March 23, 1992.

11. Plaintiff routinely handled correspondence with the IRS regarding audits and payment of taxes.

12. This request was a result of Ms. Maughen learning about Mr. Housman's extensive debt to Precision.

Mr. Greenspan testified that he subsequently met with the IRS alone to negotiate a payment plan and that these discussions resulted in a plan under which Precision was to pay approximately $2300 per week. According to IRS records, however, there is no indication that a payment agreement was struck between Precision and the IRS. The IRS history of Precision's tax situation indicates that the delinquency in Precision's payroll taxes was slowly being paid by numerous levies on the Midlantic account and regular payments from Precision of approximately $2500 per week beginning on May 22, 1991. These payments began only after the IRS filed a tax-lien notice. During the period between May 1991 and November 1991, when plaintiff's employment at Precision was terminated, the IRS contacted only Mr. Greenspan concerning Precision's tax situation. The payments and IRS enforcement action continued through November 1991. At all times during 1990 and 1991, Precision was delinquent on its payroll taxes.

One of Precision's biggest creditors was L.P. Italiana, an Italian supplier of testing kits for Precision's Acculab operations. Acculab was a profitable arm of Precision. The testing kits, which Precision repackaged after receiving them from L.P. Italiana, were Acculab's most popular product, contributing a large portion of incoming revenue. Ironically, Precision had a large backlog of orders for the testing kits because of its inability to pay L.P. Italiana enough to keep the kits in stock. Plaintiff's weekly reports reflect an ongoing problem keeping customers supplied with the popular kits. Eventually, L.P. Italiana insisted that payment for shipments be made by wire transfer instead of on open terms or letter of credit.

Precision's contract with L.P. Italiana expired on October 31, 1991. Prior to that date, L.P. Italiana notified Precision that, because of Precision's poor payment history, the contract was not likely to be renewed. Mr. Housman visited the supplier in September 1991 to discuss the potential renewal of the contract. According to plaintiff, Mr. Housman was successful in getting the supplier to agree to ship approximately $40,000 worth of kits. Plaintiff testified that Precision planned to use the proceeds to pay both L.P. Italiana and the IRS.[13]

By the beginning of November, the payment to L.P. Italiana was coming due. According to plaintiff, Mr. Housman instructed him to pay L.P. Italiana. This is disputed by Mr. Housman's deposition testimony, in which he alleges that he instructed plaintiff to pay the IRS, not L.P. Italiana. The testimony of Richard DePretto, Precision's controller at the time of the transaction, does not contradict either version. Mr. DePretto testified that he received instructions as to which creditors to pay from plaintiff, but could not determine if those instructions were originated by plaintiff or Mr. Housman.

The court finds that Mr. Housman's assertion that he instructed plaintiff to pay the IRS and not L.P. Italiana is not credible. First, his contention that the thirty-day invoice period from the date of shipment was not up could not be true if he secured a shipment immediately after his visit to L.P. Italiana in September. Second, his statement that he instructed the plaintiff to pay the IRS the proceeds is contradicted by the fact that no payments, other than the $2500 weekly payment that Mr. Greenspan had arranged, were made to the IRS either just before or after plaintiff's termination. If he was adamant about paying the IRS, he could have used the rest of the proceeds from the sale of the testing kits, approximately $40,000 according to plaintiff, to pay the IRS after plaintiff was dismissed.

On November 4, 1991, plaintiff executed a wire transfer to L.P. Italiana in the amount of $39,735.30 from National Community Bank.[14] The next day, Mr. Housman demanded that plaintiff stop the payment by contacting the bank. Plaintiff testified that Mr. Housman was angry and changed his mind about paying L.P. Italiana because it declined to continue its relationship with Preci-

---

13. The proceeds were deposited in the National Community Bank account, according to plaintiff, to avoid the risk of levy by the IRS.

14. The transfer was executed in Swiss francs. The amount transferred, according to the application for international wire transfer, was Sw Fr 56,183.04.

sion, despite Mr. Housman's reassurances. When plaintiff and Mr. DePretto were unable to stop the wire transfer, Mr. Housman confronted plaintiff, accused him of making an unauthorized payment to L.P. Italiana, and fired him.[15] According to Mr. DePretto, Mr. Housman told the other employees: "If anyone else wants to do stuff on their own, they can go too." Even Mr. Housman's deposition testimony is consistent with this version of events: Plaintiff was fired for making a payment of which Mr. Housman did not approve.

On July 24, 1992, Ms. Maughen submitted a request for a 100–percent penalty assessment against plaintiff in the amount of $304,-454.59. The IRS withheld $1287.00 from plaintiff's 1992 income tax refund as of April 15, 1993. Plaintiff filed this action on January 3, 1996, seeking to recover the withheld tax refund. The government filed a counterclaim for the unpaid balance of the penalty and interest in the amount of $305,797.53.[16] On January 30, 1996, the IRS issued a certified assessment of plaintiff's tax penalty and interest relating to Precision's liability.[17] As of that date, plaintiff's penalty and interest, minus credit for withheld tax refund, totaled $399,429.56. According to Ms. Maughen, the outstanding account due at the time of trial was $152,372.29, for the first and third quarters of 1991.

## DISCUSSION

Employers are obligated under the Internal Revenue Code (IRC) to withhold Federal insurance contributions and income taxes from employee wages in trust for the United States. See 26 U.S.C. §§ 3102, 7501 (1994). Responsible persons who fail to fulfill obligations under these provisions are subject to assessment of a 100–percent penalty on any unpaid tax. See 26 U.S.C. §§ 6671, 6672. Section 6672(a) provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

The IRC defines a person as "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). This penalty, known as the trust-fund penalty, is intended to allow the IRS to pierce the corporate veil to reach persons responsible for the payment of these payroll taxes. See Godfrey v. United States, 748 F.2d 1568, 1574 (Fed.Cir.1984) (quoting White v. United States, 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967)). "The inquiry required by the statute is 'a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.'" Id. at 1575 (quoting White, 178 Ct.Cl. at 772, 372 F.2d at 517). Two requirements must be met for a person to be subject to the trust-fund penalty: (1) the person must be a "responsible person," which means that he is under a duty "to collect such tax, or truthfully account for and pay over such tax"; and (2) that person must willfully fail to perform that duty. See Godfrey, 748 F.2d at 1574.

15. Mr. Housman, in his deposition testimony, raised concerns that the payment may have been part of a plan by plaintiff to "steal" the supplier from Precision and bring it to PolyMedco, where plaintiff was later employed. He pointed to the fact that the wire transfer took much less time to clear than previous payments. This is not out of the ordinary, however, because previous payments were made by drawdowns on a letter of credit, which take a few days to clear. This is precisely why L.P. Italiana insisted on wire-transfer payment. In any event, the court accepts plaintiff's explanation, as well as that of Mr. Metz, as to his employment by PolyMedco.

16. The counterclaim was withdrawn on April 22, 1996, pending the outcome of bankruptcy proceedings under the automatic-stay provisions in 11 U.S.C. § 362. The counterclaim was reinstated on December 2, 1997.

17. In addition to plaintiff, Mr. Housman and his wife, Kail Housman, were also assessed a penalty relating to the tax deficiency.

In tax-refund cases, the government enjoys a presumption that the IRS penalty assessment is correct if it introduces into evidence a certified copy of the assessment of liability against the plaintiff. *See United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976). The government introduced such an assessment here. Thus, the plaintiff has the burden of proving that the assessment is in error despite the fact that the penalty is asserted as a counterclaim by the government. *See Pototzky v. United States*, 8 Cl. Ct. 308, 315 (1985). The plaintiff must prove by a preponderance of the evidence that he was not a "responsible person" as contemplated under the statute or that he did not willfully fail to fulfill his duty as a responsible person. *See Whiteside v. United States*, 26 Cl.Ct. 564, 567 (1992).

## A. *Responsible Person*

In order to determine whether an individual is a responsible person, the court must look beyond formal titles and mechanical functions to search for the person or persons with ultimate authority to expend funds. *See Godfrey*, 748 F.2d at 1575. More than one person within the corporation, however, can be "responsible." *See White*, 178 Ct.Cl. at 775, 372 F.2d at 518. In other words:

> It is not necessary that an individual have the final word as to which creditors should be paid in order to be subject to liability under [section 6672]. Rather it is sufficient that the person have significant control over the disbursement of funds.

*Gephart v. United States*, 818 F.2d 469, 475 (6th Cir.1987) (citing *Neckles v. United States*, 579 F.2d 938, 940 (5th Cir.1978)). The inquiry is necessarily fact intensive. The test is whether plaintiff had the "status, duty and authority to avoid the default." *Sale v. United States*, 31 Fed. Cl. 726, 731 (1994). *See also White*, 178 Ct.Cl. at 778, 372 F.2d 513 (examining "authority, powers, and duties").

Here, plaintiff holds the titles of vice-president and general manager. The fact that a person is a corporate officer alone, however, is insufficient to hold a person responsible for the failure to pay trust-fund taxes. *See Ghandour v. United States*, 36 Fed.Cl. 53, 60–61 (1996). It is merely more probative where the person's status makes him the "'single most important individual' in the business affairs of the corporation." *See Godfrey*, 748 F.2d at 1575–76. While the court recognizes that plaintiff played an important role in the operations of the company and that his role may be sufficient to find him responsible, it cannot be said that he was the single, most important individual in Precision's affairs. That was Mr. Housman, who owned the majority of stock in Precision, and who exercised an iron grip on the operations of the company. Without his status, the court would no doubt be disinclined to hold plaintiff liable, but his status, by itself, is not determinative.

Plaintiff's duties provide a clearer picture of whether he should be held "responsible." It is undisputed that plaintiff's duties involved financial matters, including maintaining a record of accounts payable, such as payroll taxes. He was the second in command and was involved in coordinating the payment of creditors. He signed some payroll-tax forms. As vice-president and general manager, it was his responsibility to ensure that the accounts payable were processed efficiently and accurately before they were presented to. Mr. Housman. He had the duty, therefore, to report tax delinquencies to Mr. Housman. He was also tasked, along with Mr. Greenspan, with negotiating with the IRS. In fulfilling those duties, plaintiff would have been fully knowledgeable that Precision was delinquent in its payment of withholding taxes. On the other hand, he did not negotiate contracts with creditors or loans with lenders. Nor, as explained below, did he have anything other than very limited check-signing authority.

Plaintiff thus had sufficient status to be held responsible and his duties made him fully aware of tax deficiencies. The most telling question in this case, however, is whether plaintiff had the authority to ensure that payments were directed to the IRS, instead of other creditors. The Federal Circuit has explained some of the relevant considerations:

[A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the checks of the corporation . . . or to prevent their issuance by denying a necessary signature . . . or where that person controls the disbursement of the payroll . . . or controls the voting stock of the corporation . . . he will generally be held "responsible".

*Godfrey*, 748 F.2d at 1576 (citations omitted).

█ In this case, plaintiff did not control the voting stock. In fact, he was not a shareholder. He could not prevent the issuance of checks by withholding his signature. His control over payroll was no greater than whatever check-writing authority he had. In this case, therefore, check-signing authority will be crucial to consider. *See White*, 178 Ct.Cl. at 778, 372 F.2d at 520. The overall inquiry is whether plaintiff had "the power to compel or prohibit the allocation of corporate funds." *See Godfrey*, 748 F.2d at 1576. Generally, a person with independent check-signing authority on the company's accounts meets that test. *See, e.g., Whiteside*, 26 Cl. Ct. at 573 (finding vice-president and general manager who was only authorized signor on bank accounts liable). *But see Stewart v. United States*, 19 Cl.Ct. 1, 7 (1989) (finding doctor was nominal figure of authority even though he had sole check-signing authority).

█ According to the bank signature cards, Mr. Housman, his wife, and plaintiff all had check-signing authority on Precision's bank accounts. According to plaintiff, however, his check-signing authority was strictly limited. This is confirmed by Mr. Housman's memorandum of March 3, 1990, which stated "no checks signed except by me." Plaintiff did sign some checks, however, but he explained that occurred only in case of an emergency—an immediate threat to the company's ability to function, such as an imminent risk that the power would be shut off. Even then, "emergencies" were limited to

situations when Mr. Housman was not in the office. This is supported by the paucity of checks signed by plaintiff introduced by defendant at trial. Defendant introduced fifteen checks that were signed by plaintiff. The majority of these were transfers of funds between Precision's bank accounts.[18] Only two of the checks were payments to creditors. Plaintiff testified that, in both instances, the creditors threatened immediate action if not paid and that Mr. Housman was not available to sign a check.

For practical purposes, therefore, plaintiff's check-signing authority was exercised infrequently and fundamentally ministerial. Despite Mr. Housman's testimony that plaintiff had full authority to pay creditors, the circumstances, particularly plaintiff's termination and the March 3, 1990, memorandum, indicate otherwise.

Furthermore, the courts are reluctant to find responsible a plaintiff who is dominated by another person in the company. *See Williams v. United States*, 25 Cl.Ct. 682, 685 (1992); *Heimark v. United States*, 18 Cl.Ct. 15, 24 (1989). In *Williams*, plaintiff had the "seemingly important titles" of vice-president, treasurer, and office manager and check-signing authority. The court declined to find liability because the company was a "one-man operation" dominated by plaintiff's father, the president of the company. While he allowed plaintiff to sign some checks and contracts, the court noted that plaintiff was never given discretion in the payment of bills. In *Heimark*, plaintiff was the comptroller and minority stockholder in the company. He had co-signing authority on the company's accounts. The court declined to find him responsible because it found he was dominated by the company president, who maintained a tight grip on accounts payable. The president circulated a memorandum that stated "no payments to be sent without my specific approval."

Like the plaintiffs in *Williams* and *Heimark*, the plaintiff here did not have the discretion to choose among creditors. Those

---

**18.** A number of checks were written to Claire Housman, Mr. Housman's mother, who apparently was a creditor to the company because of prior loans. These checks, however, were indorsed to Precision and deposited into Precision's accounts. While it is unclear what the purpose of these transactions was, the effect was to leave funds within Precision's accounts.

decisions were made by Mr. Housman. Plaintiff may have provided input into the process, but he could not compel, nor could he prohibit, the payment of bills.

There is case law from other jurisdictions suggesting that a person with check-signing authority will be held responsible even though he is directed by a superior to avoid paying the tax and even though he risks losing his job if he disobeys the instruction. *See Greenberg v. United States*, 46 F.3d 239, 243–44 (3d Cir.1994); *Brounstein v. United States*, 979 F.2d 952, 955 (3d Cir.1992); *Gephart*, 818 F.2d at 474–75; *Roth v. United States*, 779 F.2d 1567, 1572 (11th Cir.1986); *Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983). These cases however, are distinguishable because they involve litigants who were otherwise responsible persons despite being instructed not to pay.

In *Greenberg*, plaintiff was an officer and minority shareholder in the company who routinely signed payroll and other checks. He also hired and fired employees. Most importantly, the decisions to pay certain creditors were made jointly by Greenberg and the company president. In other words, he possessed and exercised the authority to choose which creditors to pay. The Third Circuit held that the mere fact he was instructed to pay certain creditors by the company president did not exculpate him. *See Greenberg*, 46 F.3d at 243–44.

In *Brounstein*, plaintiff routinely signed payroll checks to employees and often signed stock certificates, income-tax returns, and business financial disclosures and held the positions of president and assistant treasurer. The company bylaws vested Brounstein with managerial authority to run the operations of the company. He alleged, however, that he merely "rubber stamped" decisions by a member of the board of directors of the company. The board member held the checks, made all hiring and firing decisions, opened the mail, received incoming funds, and disbursed those funds. Brounstein alleged that the principal directed him not to pay taxes. The Third Circuit nevertheless affirmed a finding of responsibility. The court held that the allegation that Brounstein was acting under orders was irrelevant; he was otherwise responsible. *See Brounstein*, 979 F.2d at 955.

In *Gephart*, plaintiff was not a shareholder, director, or officer, but merely a general manager who had ordinary day-to-day administrative responsibilities and who had the authority to sign checks and negotiate with creditors. He signed most of the checks and had the authority to hire and fire office personnel. Most importantly, he had the authority to initially determine which creditors would be paid. Gephart exercised this authority often. The Sixth Circuit held that the plaintiff had significant control over the disbursement of funds despite allegations that the corporate president directed him not to pay. *See Gephart*, 818 F.2d at 474–75.

In *Howard*, plaintiff, a director, minority shareholder, treasurer, and vice-president in the company with check-signing authority, was found responsible by the trial court. He routinely paid employees and creditors, including the IRS at one point. The majority shareholder had directed Howard not to pay the IRS. The Fifth Circuit held that he was otherwise responsible despite the fact that he may have been fired had he disobeyed the majority shareholder's instructions:

> The fact that Jennings might well have fired Howard had he disobeyed Jennings' instructions and paid the taxes does not make Howard any less responsible for their payment.... Howard had the status, duty, and authority to pay the taxes owed, and would only have lost that authority after he had paid them. Authority to pay in this context means *effective* power to pay. That Howard had this authority was demonstrated by the fact that he did issue small checks without Jennings' approval on a number of occasions.... Had Jennings fired Howard for paying the taxes, Howard would at least have fulfilled his legal obligations.

*Howard*, 711 F.2d at 734 (citations omitted).

The plaintiffs in the above cited cases exercised more authority than plaintiff here. In *Brounstein* and *Howard*, the plaintiffs routinely signed payroll and creditor checks without independent authorization. In *Gephart* and *Greenberg*, plaintiffs clearly had the

authority, whether through corporate bylaws or other means, to choose between creditors. The plaintiff here did not exercise either authority. Mr. Housman alone would decide who would be paid. Mr. Housman's March 3, 1990, memorandum explicitly limits the authority to approve payments to Mr. Housman. While the existence of another responsible person would not excuse plaintiff, Mr. Housman retained such exclusive authority that plaintiff effectively had none when dealing with creditors. The fact that Mr. Housman stated in a memorandum that plaintiff had "full authority" related only to dealing with employees on behalf of Mr. Housman, not in dealing with creditors or deciding on how funds were to be disbursed.

There is no evidence here of routine payments signed by plaintiff. Defendant produced only two checks to creditors signed by plaintiff over the course of his years as vice-president. Both involved the limited emergency situations for which plaintiff was given authority by Mr. Housman to sign checks. Plaintiff's lack of authority is further demonstrated by his dismissal. Because he did not have the authority to direct payments or to prevent them, plaintiff was not a responsible person under section 6672.

## B. *Willfulness*

Because we find he was not a responsible person, plaintiff is not subject to the 100–percent penalty and is thus entitled to his refund. Assuming, arguendo, that plaintiff were a responsible person, the facts indicate that very few, if any, payments were made willfully by plaintiff.

> Whether "the failure to pay the overdue taxes [is] willful has been seen ... as calling for proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing—and not as requiring a special intent to defraud or deprive the Government of monies withheld on its account."

*Godfrey,* 748 F.2d at 1576–77 (alterations in original) (quoting *Scott v. United States,* 173 Ct.Cl. 650, 655, 354 F.2d 292, 295 (1965)). Personal fault is a necessary element of willfulness. *See Slodov v. United States,* 436 U.S. 238, 254, 98 S.Ct. 1778, 1788–89, 56 L.Ed.2d 251 (1978); *Godfrey,* 748 F.2d at 1577.

It is clear that plaintiff knew that taxes were owed to the IRS. His weekly reports reflect an ongoing concern over the company's payroll taxes. He was intimately involved with tracking the pending accounts payable and thus knew what was owed and what was paid. Furthermore, he was peripherally involved with the negotiations between Precision and the IRS. Thus any payments to others which originated with plaintiff were made during the time he had knowledge of a delinquency. The court can only identify three payments to creditors executed by plaintiff personally, or directed by plaintiff and executed by another,[19] that could potentially be considered willful: (1) the October 22, 1991, payment to Peterson Marsh Metal Industries for $537.21; (2) the October 28, 1991, payment to Mac's Cleaning for $642.00; and (3) the November 4, 1991, wire transfer to L.P. Italiana for $39,735.30, which ultimately led to plaintiff's termination. Thus, even if plaintiff were held responsible, his liability would be limited to $40,914.51 plus interest.

## CONCLUSION

The court holds that plaintiff is not a "responsible person" under 26 U.S.C. § 6672. Accordingly, the Clerk is directed to enter judgment for plaintiff in the amount of $1287.00, plus interest in accordance with law. Defendant's counterclaim is dismissed. No costs.

---

19. The court also concludes that holding plaintiff liable for all payments made by Precision, including those made by Mr. Housman with plaintiff's knowledge, would be fundamentally unfair. *See White,* 178 Ct.Cl. at 772, 372 F.2d at 516. Mr. Housman had signing authority and did not require plaintiff's signature. There was nothing plaintiff could do to prevent the issuance of checks or other payments by Mr. Housman to creditors other than the IRS.